UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING,<br><br>   Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br><br>   Defendant. | Case No. 19-cv-4541 LB |

**DECLARATION OF DAVID M. HARDY**

I, David M. Hardy, declare that the following statements are true and correct to the best of my knowledge and are based on my own personal knowledge, on information contained in the records of the Federal Bureau of Investigation ("FBI"), or on information supplied to me by employees under my supervision. If called upon to testify, I would testify competently to the facts set forth in this declaration.

1. I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), of the FBI, in Winchester, Virginia. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

2. In my official capacity as Section Chief of RIDS, I supervise approximately 243 FBI employees, supported by approximately 73 contractors, who staff a total of twelve (12) FBI Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and

1  information pursuant to the FOIA, as amended by the OPEN Government Act of 2007 and the OPEN
2  FOIA Act of 2009; the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order
3  ("E.O.") 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and
4  Presidential and Congressional directives. The statements contained in this declaration are based upon
5  my personal knowledge, upon information provided to me in my official capacity, and upon conclusions
6  and determinations reached and made in accordance therewith.

7      3.    Due to the nature of my official duties, I am familiar with the procedures followed by the
8  FBI in responding to requests for information from its files pursuant to the provisions of the FOIA,
9  5 U.S.C. § 552. Specifically, I am familiar with the FBI'S handling of the Plaintiff's FOIA request for
10 records related to Indonesian citizen, Anthonius Wamang, in connection to the attack in Indonesia on
11 August 31, 2002 resulting in the deaths of two American citizens.

12     4.    This declaration is submitted in support of the FBI's Motion for an Order Preserving
13 Certain Exemptions and Bifurcating Proceedings. In order to provide the Court and Plaintiff with an
14 explanation of the basis for the amount of time requested by the FBI to review responsive records, this
15 declaration provides 1) a description of the nature of responsive records; 2) an overview of the FBI's
16 efforts to respond to an unpredictable and significant increase in the agency's FOIA workload; 3) a
17 proposed processing schedule for both categorical 7(A) bifurcated review and full categorical review of
18 the responsive records, including an explanation of the process the FBI uses to perform the respective
19 reviews at the litigation stage; and 4) a proposed timeline for the release of any segregable public source
20 information identified through its review.

## I. NATURE OF THE RESPONSIVE RECORDS

22     5.    Through searches of its records, the FBI located a pending investigative file pertaining to
23 Anthonius Wamang and an attack on August 31, 2002, in Tembagapura, Papua Province, Indonesia,
24 resulting in the death of two American citizens, Ricky Lynn Spier and Leon Edwin "Ted" Burgon. The
25 subject of the responsive investigative file, Anthonius Wamang, has been convicted in Indonesia where
26 he is serving a prison sentence.

27     6.    The FBI's Record/Information Dissemination Section ("RIDS") contacted the case agent
28 for the responsive investigatory file to determine whether the release of the information within this file

DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

would cause harm to pending enforcement proceedings. The FBI's case agent was adamant in precluding the release of these records because information and evidence contained within the FBI's investigatory files could be used in the government's future prosecution of Anthonius Wamang. Thus, release of any of this information would be premature and allow for Wamang to potentially prepare alibis, intimidate potential witnesses, and/or destroy evidence of his wrongdoing (through his own efforts or by proxy) to thwart the United States' attempts to prosecute him. The Assistant United States Attorney ("AUSA") prosecuting this case confirmed there is a pending indictment of Wamang in the United States District Court for the District of Columbia. *See United States of America v. Anthonius Wamang*, 1:04-cr-00283-1. This AUSA also confirmed the United States will pursue prosecution of the subject upon his release from detainment in Indonesia.

7.  Under 5 U.S.C. § 552(b)(7)(A), an agency may categorically deny access to records if the records were compiled for law enforcement purposes and the production of such records could reasonably be expected to interfere with law enforcement proceedings. In this case, the FBI identified main files responsive to Plaintiff's request, the release of which could reasonably be expected to interfere with pending law enforcement proceedings. As a result, the FBI is categorically denying access to these records under FOIA Exemption (b)(7)(A) because the production of such records could reasonably be expected to interfere with law enforcement proceedings.

8.  As of this date, RIDS estimates that the responsive records relating specifically to Anthonius Wamang consist of approximately 23,000 pages of responsive material and approximately 47 hours of media, including video and audio footage. Moreover, following a logical lead in reviewing the investigative file for Anthonius Wamang, the FBI located approximately 1,400 pages of additional responsive material pertaining to co-conspirators involved in the attack on August 31st, 2002. We will process all responsive records, consisting of approximately 24,400 pages, in the timeline set forth below.

## II. THE FBI'S FOIA WORKLOAD

### UNPREDICTABLE GROWTH IN THE NUMBER OF REQUESTS SUBMITTED TO THE FBI

9.  The FBI is currently inundated with an extraordinary amount of Freedom of Information/Privacy Act ("FOIPA") requests. In recent years the FBI has experienced a spike in requests submitted to the agency. In Fiscal Year ("FY") 2019, the FBI received 31,344 FOIPA requests (a 78%

increase over intake from five years ago), when in FY 2014, intake was 17,653 requests. In FY 2019, the FBI resolved 31,962 FOIPA requests and reviewed over one million pages of records in response to FOIPA requests.

## INCREASE IN COMPLEXITY OF REQUESTS

10. Over the past several years, requests have grown significantly more complex. Many of the requests which the FBI receives today are no longer simple, relatively straightforward, first-party requests from individuals seeking investigative records about themselves, e.g., a request for a single bank robbery file. Rather, many of the requests contain numerous and/or multi-faceted subjects and often require much more coordination with external and internal stakeholders to ensure the FBI makes appropriate disclosure decisions.

11. In cases like this where there are thousands of pages, the volume of material proportionally impacts - and dramatically affects - the complexity of the FOIPA processing required as well as the resources and time needed to respond to a particular request. The FBI's experience is that as the number of pages in a request increases, the work and complexity associated with responding to a request proportionally increases as well. This includes increases in the number of referrals (for either consultation or direct response) to other DOJ components and agencies, the need for internal reviews, classification/declassification considerations, and the time needed to conduct page-by-page, line-by-line reviews of all potentially responsive material to determine what can be released and/or withheld.

12. Additionally, RIDS has found FBI records increasingly contain more other federal government agency ("OGA") information. After reviewing the United States Government's response to the terrorist attacks of September 11, 2001, the National Commission on Terrorist Attacks upon the United States ("9/11 Commission") recommended agencies within the federal government increase their ability to share and collaborate on gathered intelligence.[1] The FBI, like other members of the United States Intelligence Community, adopted this recommendation. This means FBI records increasingly contain OGA information equities. This requires the FBI seek these OGA's redaction determination prior to

---

[1] *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States.* Chapter 13, "How to do it? A Different Way of Organizing the Government." U. S. Government Printing Office.

DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

1  releasing their information. Thus, increased inter-agency information sharing has increased the administrative burden associated with processing FOIA requests to ensure such information is appropriately vetted before public dissemination. This has forced RIDS to devote more of its finite resources to disseminating and tracking a growing number of FOIPA referrals and consultations with OGAs.

13. Furthermore, the subject matter of requests received by the agency has mirrored the changing nature of the crimes investigated by the FBI. In a hearing before the Senate Judiciary Committee on July 8, 2015, former FBI Director James Comey informed Congress as our society has increased its reliance on technology, so have criminals; thus, the FBI has "been forced to consider how criminals and terrorists might use advances in technology to their advantage." Essentially, as criminals, terrorists, and those who threaten the national security of the United States become more technologically savvy, so must the FBI. This directly impacts the nature of FOIPA requests received by the FBI. Requests increasingly require RIDS FOIA processors to seek guidance from FBI personnel, outside of IMD, with the subject matter expertise needed to make informed, appropriate disclosure decisions. Parallel to this, RIDS has been forced to focus more of its finite resources on developing a specialized workforce able to meet the demands of more sophisticated FOIPA requests.

14. Our society-wide growing reliance on technology has also dramatically transformed the nature of FBI records. In July 2012, the FBI adopted the case management system Sentinel, and for the first time in its century-long existence, FBI digital records became official government records. Prior to the advent of Sentinel, FBI paper and physical records were considered the official records of the agency. As such, even while RIDS is focusing on technological advances to eliminate paper-based, manual processes to enhance FOIA production, historically, the program has focused the bulk of its resources on processing page-based records. Increases in the availability and prevalence of digital video and audio technologies have led to a steady increase in this type of medium within FBI records which add another processing dimension. Therefore, RIDS has been forced to also dedicate more of its finite resources on developing its workforce's capability and expertise to process an increasing number of audio and video records.

DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

## INCREASE IN FOIA LITIGATION DEMANDS

15. In addition to the demand posed by the complexity and significant volume of requests, there is a constant litigation demand imposed on the FBI by those requests that become the subject of litigation. The FBI is currently involved in approximately 344 pending FOIPA litigations, many of which have court ordered/established processing deadlines. This puts tremendous strain on RIDS' limited FOIPA processing resources. The below tables represent this progression between 2014 and the present.

| Fiscal Year | Number of Pending FOIA Litigations |
|---|---|
| 2014 | 160 |
| 2015 | 180 |
| 2016 | 223 |
| 2017 | 252 |
| 2018 | 292 |
| 2019 | 338 |
| Current 2020 | 344 |



Pending FOIA Litigation Involving the FBI

16. In the last six years, the number of FOIPA litigations has unpredictably increased to all-time program highs. Here, predictability is inherently elusive. While there may be some correlation to the overall rise in request volume, RIDS has no data which can predict which and how many FOIPA requesters will elect to seek judicial relief. As depicted in the charts above, there was a 111% increase in FOIPA litigations involving the FBI between FY 2014 and FY 2019. In FY 2019 alone, the FBI received 151 new FOIPA lawsuits directly against the FBI, or lawsuits against other government agencies that involve FBI records. This one year increase is nearly equal to the total number of FOIPA litigations

DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

involving the FBI in FY 2014 (151 new litigations compared with 160 total pending litigations). Further exacerbating this spike in pending litigations, the litigations themselves have mirrored the trend seen in the FOIPA requests recently received by the FBI – they have become increasingly more complex. In terms of monthly processing output, at least 91 of the FBI's FOIPA requests in litigation currently have processing demands. Approximately 50 of these cases require monthly releases of information. This represents approximately 25% of RIDS' resources, but only accounts for one percent of requests processed by RIDS. In other words, any increase in processing demands for litigations has a tangible negative impact on the FBI's ability to equitably distribute its resources to provide records to a wider requester community.

17. Additionally, by nature, the work allocated to a request in litigation is much more labor intensive relative to a request processed administratively as there is a trove of additional administrative tasks which attach to requests in litigation such as: tracking the FBI's application of Exemptions to properly defend this information against potential future challenges; Bates stamping; and the added review of connecting the document processing to specific written justifications in the agency declaration in support of summary judgment. In some instances, this may as much double the amount of resources needed when compared to traditional, administrative FOIPA requests. Finally, many of these litigations involve complex or high volumes of records. Examples of these larger/more complex litigations include, but are not limited to:

| Civil Action No. | Case Title | Court[2] | Subject | Monthly Production[3] |
|---|---|---|---|---|
| 18-cv-4009 | Wasim Mohammad v. FBI | NDCA | Death of Faisal Mohammad | 500 ppm |
| 16-cv-02320 | Freedom Watch v. Bureau of Land Management, et al. | DDC | Cliven Bundy, et al. | 500 ppm |
| 16-cv-01506 | Francisco Martinez v. DOJ | DDC | Chicano Civil Rights Movement | 500 ppm |
| 17-cv-03842 | Radar Online, et al. v. FBI | SDNY | Church of Scientology | 500 ppm |

---

[2] For ease of the Court, districts have been abbreviated by, "ND" (Northern District), "SD" (Southern District, "ED" (Eastern District), "WD" (Western District), "CD" (Central District), or only "D" for District; and the two letter state postal code for the states in which districts reside.

[3] Pages per month is abbreviated as "ppm."

DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

| | | | | |
|---|---|---|---|---|
| 17-cv-2503 | Property of the People, et al. v. Department of Homeland Security ("DHS"), et al. | DDC | Black Lives Matter, Black Identity Extremism, et al. | 500 ppm |
| 16-cv-1790 | Colbert v. FBI et al. | DDC | D.B. Cooper Skyjacking | 500 ppm |
| 19-cv-1495 | Fassett v. FBI | DDC | Adrian Lamo | 500 ppm |
| 19-cv-0290 | American Civil Liberties Union, et al. v. DOJ, et al. | NDCA | Social Media Surveillance | 500 ppm |
| 18-cv-1885 | Lerone Martin v. DOJ | DDC | William (Billy) Graham, Jr. | 500 ppm |
| 19-cv-4048 | Ader v. FBI, et al. | NDIL | Jon Burges | 500 ppm |
| 18-cv-2563 | Judicial Watch v. DOJ | DDC | Investigation of Iman Awan, et al. | 500 ppm |
| 18-cv-381 | Joshua Phillips v. DHS, et al. | DDC | Hate Crimes since 2015 | 500 ppm |
| 19-cv-726 | Judicial Watch v. DOJ | DDC | FBI communications of senior officials regarding Russian interference | 500 ppm |
| 18-cv-2855 | Charles Gibbons v. DOJ | DDC | International Solidarity Movement | 500 ppm |
| 16-cv-00475 | Judicial Watch v. DOJ | DDC | Adnan Gulshair Shukrijumah | 500 ppm |
| 18-cv-262 | Judicial Watch v. DOJ | DDC | Comey Collection | 500 ppm |
| 19-cv-1465 | Center for Media Justice, et al. v. FBI, et al. | NDCA | Black Identity Extremism | 500 ppm |
| 18-cv-154 | Judicial Watch v. DOJ | DDC | Communications between Peter Strzok and Lisa Page | 500 ppm |
| 18-cv-1459 | Center for Investigative Reporting v. DOJ | NDCA | June 2, 1965 incident involving the Klu Klux Klan | 500 ppm |
| 18-cv-1868 | Assassination Archives and Research Center v. DOJ | DDC | FBI Electronic Surveillance ("ELSUR") index cards and FOIA processing records | 500 ppm |
| 18-cv-01833 | Daily Caller v. FBI | DDC | Richman, Daniel | 500 ppm |

In summary, the FBI is inundated with an unexpected increase in the amount of FOIPA requests submitted to the agency and FOIPA litigations involving the FBI. Instead of experiencing the peaks and valleys of incoming requests within a relatively predictable range of annual requests, recent figures demonstrate the FBI's annual volume of requests and litigations have surged to unprecedented levels. Compounding this climb in workload, FOIPA requests have changed drastically in their nature with the added administrative

DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

burdens associated with processing. These exceptional circumstances – with the unexpected strain on static FOIPA processing resources – has made it virtually impossible for RIDS to respond to Plaintiff's FOIA request within the FOIA's statutory time limits and requires the FBI strategically balance its resources to ensure its responding to the whole of its requester community, as equitably as possible.

### III. PROPOSED PROCESSING SCHEDULE

#### A. BIFURCATED REVIEW

18. During a categorical bifurcated 7(A) review, the FOIA analyst must (1) review each record on a document-by-document basis; (2) identify the type of document (e.g., e-mail, electronic communication, interview, investigative report, etc.); (3) group the documents into functional categories (i.e., administrative, evidentiary/investigative, or public source/non-investigative harm materials); and (4) analyze each record to determine if its release would interfere with ongoing law enforcement proceedings. If the analyst determines the release of the particular document could interfere with any enforcement proceeding, the record is exempt in its entirety. If and when segregable information (e.g., public source) is located, the analyst will then process the information for release to the Plaintiff.

19. In addition to asserting FOIA Exemption (b)(7)(A) and assigning a functional category to each document, an agency must also assert all underlying exemptions during the original district court proceeding unless bifurcation is requested and granted by the court. The process of reviewing Exemption 7(A) material for additional underlying exemptions transforms the review process from a categorical document-by-document review, to a much lengthier review to identify additional, underlying exemptions for assertion despite the blanket coverage of Exemption 7(A).

20. The FBI respectfully requests an order permitting it to move for summary judgment based on the applicability of Exemption 7(A) without waiving its ability to assert additional FOIA exemptions in the future. If the Court grants the FBI's motion, Exemption 7(A) would be litigated given its categorical applicability, and in the event Exemption 7(A) would expire during the pendency of this FOIA litigation – or if the Court rejects the FBI's withholdings under Exemption 7A – the underlying exemptions would be preserved. If the motion is granted, the FBI proposes a time period of six (6) months, namely, until June 31, 2020, in which to identify documents for withholding under functional Exemption 7(A) categories as well as process and release to plaintiff any additional segregable material. The FBI has

DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

identified, to-date, approximately 24,400 pages of responsive material and approximately 47 hours of media. The requested processing schedule will provide adequate time for the FBI to review and categorize each record as well as identify and release all segregable material. The FBI also proposes a time period of two months, namely, until August 31, 2020, to prepare and file a declaration fully explaining its assertion of Exemption 7(A). The FBI will issue to Plaintiff interim releases of segregable material, if located during its review.[4]

### B. FULL REVIEW FOR UNDERLYING EXEMPTIONS

21. Traditionally, the effort and time necessary to process a 7(A) case when bifurcation is denied was comparable to that required to process a non-7(A) case.[5] However, the FBI recently developed means of leveraging optical character recognition (OCR) technology and electronic searches to more efficiently review categorically exempt records. This process has greatly reduced the amount of time necessary for the review of underlying Exemptions and functional categories. However, there are still factors that impact the additional amount of time required to process records when bifurcation is denied.

22. A full review for all applicable underlying exemptions requires RIDS to actually obtain all portions of the file not electronically available. Rather than relying on document summaries to further explain the role of documents in the pending investigation or prosecution, and how release of these documents could harm pending law enforcement proceedings, RIDS must analyze each document for information exempt under one or more other exemptions. The determination for many of these Exemptions entails further research and extensive legal analysis. For example, when a document indicates that information within was provided by a confidential source, the analyst must then research the source to determine if they were granted an express assurance of confidentiality or if the FBI can protect the

---

[4] *See infra*, Section III, sub-section C, regarding the FBI's proposed timeline and initial release of segregable material on or before January 24, 2020.

[5] Historically, since there was no practical difference between the steps involved in processing a 7(A) case versus a non-7(A) case where underlying exemptions must be identified and asserted, the FBI applied its standard interim release policy of reviewing and processing the records in 500 page increments. This 500 pages per month interim release policy was established on or about January 2010. In reviewing the FBI's interim release policy, in the context of the fees charged for the monthly 500 page releases, the U.S. Court of Appeals for the District of Columbia Circuit endorsed the FBI's interim policy, recognizing it "serves to promote efficient responses to a larger number of requesters" based on the FBI's "reasonable" and "non-obstructionist" explanation of its program objective of providing more requesters with more pages on a consistent basis. *See National Security Counselors, et al. v. United States Department of Justice*, 848 F.3d 467, 472 (D.C. Cir. 2017).

DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

source's information pursuant to Exemption 7D based on a presumption of confidentiality (implied confidentiality). Such research can be rather time consuming and has little to no bearing on the fact that the FBI will continue to withhold the entire record pursuant to Exemption 7(A); essentially, the same amount of effort is required, while neither positively nor negatively affecting the actual release of the information while Exemption 7(A) remains intact.

23. A review for all applicable Exemptions also requires RIDS conduct a classification review, which is necessary in order to assert Exemption (b)(1). This means the documents are not solely reviewed by a RIDS FOIA analyst, they are also reviewed by a RIDS Classification analyst. Classification analysts are specifically trained to research, review, and make classification determinations on FBI information. Only a small portion of RIDS analysts are qualified to conduct Classification reviews relative to those applying FOIA exemptions. This is yet another factor that increases the amount of additional time required when asserting all exemptions at once.

24. Upon completion of the initial review of the responsive records for applicable underlying Exemptions, multiple layers of review to ensure accuracy and adequate protection of exempt FBI equities must occur. Both the FOIA analyst and the Classification analyst's work is typically reviewed by an Expert level employee or Supervisor. Additionally, for cases in litigation, the processing is reviewed by and analyzed for litigation defense purposes by both a RIDS Litigation Support analyst and an attorney from the FBI's Office of General Counsel. Beyond this review, another review may be conducted by the Assistant United States Attorney representing the FBI in the matter for the purpose of ensuring that all redactions are legally defensible. These are just a few of the factors that impact the amount of time required to process records when bifurcation is denied.

25. Considering the preceding factors, in the event that the FBI's motion for bifurcation is denied, the FBI is requesting an additional four (4) months, namely, until October 31, 2020, to complete the review needed to assert all applicable underlying exemptions. The FBI also proposes a time period of sixty (60) additional days, namely, until December 31, 2020, to prepare and file a declaration detailing the FBI's FOIA Exemption 7(A) claim as well as explaining each underlying FOIA Exemption.[6]

---

[6] In the event the pending enforcement proceeding on which the viability of Exemption 7(A) relies concludes, the FBI will require additional time to conduct a page-by-page, line-by-line review and portion mark any information exempt pursuant to applicable FOIA Exemptions at a rate of 500 pages per month

DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

## C. RELEASE OF SEGREGABLE MATERIAL

26. In a good faith effort to provide Plaintiff with segregable material as quickly as possible, the FBI will start its review focusing on a sub-file within Wamang's file containing public source records. The FBI will complete its review of the sub-file and provide all non-exempt documents to Plaintiff on or before January 24, 2020. Subsequently, the FBI will make future releases of segregable material as it completes its review of all responsive records.

## **CONCLUSION**

27. The FBI is currently inundated with a deluge of incoming FOIPA requests and pending FOIPA litigations. Considering there is such a substantial pinch of the FBI's limited FOIPA processing resources, the FBI must allocate its resources equitably in order to serve all requesters who seek records from the Bureau, and avoid allocating excess resources to processing FOIPA litigations such as Plaintiff's, disenfranchising large portions of its requester community. Typically, in a traditional FOIPA litigation in which the FBI is reviewing for all pertinent FOIA Exemptions, the FBI avoided such resource imbalances by processing records at a rate of 500 pages per month. *See* the chart at paragraph 17 showing numerous FOIPA litigations where the FBI is processing at a rate of 500 pages per month. However, the FBI recently developed a means of completing reviews of categorically exempt records, leveraging technology to assist analysts in their reviews, at a rate beyond 500 pages per month. Still, a review for all underlying Exemptions in these types of cases requires additional time beyond that required to only establish the applicability of Exemption 7(A). Therefore, considering Exemption 7(A) is the overriding Exemption precluding records from release, the FBI respectfully requests bifurcation in an effort to narrow the scope of issues and debate the categorical denial of records under FOIA Exemption (b)(7)(A) first. If bifurcation is granted, the FBI respectfully requests a time period of six (6) months, namely, until June 31, 2020, in which to identify documents for withholding under functional Exemption 7(A) categories as well as process and release to Plaintiff any additional segregable material. The FBI also proposes a time period of two months, namely, until August 31, 2020, to prepare and file a declaration fully explaining its

in accordance with the FBI's standard processing practices.
DECLARATION OF DAVID M. HARDY
NO. 19-cv-4541 LB

assertion of Exemption 7(A). If the FBI's request for bifurcation is denied, the FBI requests an additional four (4) months, namely, until October 31, 2020, to complete the review needed to assert all applicable underlying exemptions. The FBI also proposes a time period of sixty (60) additional days, namely, until December 31, 2020, to prepare and file a declaration detailing the FBI's FOIA Exemption 7(A) claim as well as explaining each underlying FOIA Exemption.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of December, 2019.

David M. Hardy
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia