1  D. Victoria Baranetsky (Cal. Bar No. 311892)
2  THE CENTER FOR INVESTIGATIVE
   REPORTING
3  1400 65th St., Suite 200
   Emeryville, CA 94608
4  vbaranetsky@revealnews.org
   Telephone: (510) 982-2890
5
6  Attorney for Plaintiff
7
8
9                    UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                     SAN FRANCISCO DIVISION

11  THE CENTER FOR INVESTIGATIVE          )   Case No. 3:19-cv-4541-LB
    REPORTING,                            )
12                                        )   **OPPOSITION TO DEFENDANT'S**
                            Plaintiff,    )   **MOTION FOR SUMMARY JUDGMENT**
13                                        )   **AND**
         v.                               )
14                                        )
                                          )   **NOTICE OF CROSS MOTION AND**
15  FEDERAL BUREAU OF INVESTIGATION,      )   **CROSS MOTION FOR SUMMARY**
                            Defendant.    )   **JUDGMENT; MEMORANDUM OF**
16                                        )   **POINTS AND AUTHORITIES IN**
                                          )   **SUPPORT OF CROSS MOTION FOR**
17                                        )   **SUMMARY JUDGMENT**
                                          )
18                                        )   Date:  January 14, 2021
19                                        )   Time: 9:30 AM
                                          )   Place: Courtroom B, 15th Floor
20                                        )
                                          )
21                                        )
                                          )
22                                        )
                                          )
23                                        )
24  _____
25
26
27
28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.      INTRODUCTION ....................................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................... 2

    A.      The Subject of the Records: Anthonius Wamang and the Timika Conflict. ..................... 2

        1.      The West Papua Conflict and the Freeport Mine. ............................................................ 2

        2.      The Freeport Road Ambush. ............................................................................................. 3

        3.      The Surrender and Indonesian Trial of Anthonius Wamang. ........................................... 4

        4.      Continued Concerns as to TNI Involvement and FBI Wrongdoing. ................................. 6

    B.      CIR's FOIA Request, the FBI's Response, and Subsequent Litigation History ............... 7

III.    ARGUMENT ............................................................................................................... 8

    A.      FOIA Establishes a Presumption of Disclosure, and the Government Bears the Burden of Proving that Withheld Records are Clearly Exempt. ................................................................ 8

    B.      *In Camera* Review is Necessary Because the FBI Offers Only General Descriptions of the Withheld Records. .......................................................................................................................... 9

    C.      The FBI Improperly Withholds Information Already in the Public Domain. ................. 10

    D.      FBI Must Disclose Information Under the Foreseeable Harm Standard. ........................ 11

    E.      FOIA Requires Portions of the Records To Be Reasonably Segregated. ....................... 12

    F.      The FBI Has Improperly Withheld Records Under Exemption 7(A) Because There is No Possibility of Prosecution. ........................................................................................................... 12

    G.      Exemption 1 Does Not Apply Because the FBI Does Not Satisfy EO 13,256. .............. 15

    H.      The FBI Incorrectly Withholds Records Under a Sweeping Interpretation of Exemption 3 and Provides Inadequate Support for Its Assertions. .................................................................. 17

    I.      The FBI Has Failed to Carry Its Burden as to Exemption 4. ......................................... 20

    J.      The FBI Has Failed to Carry Its Burden as to Exemption 5. ......................................... 22

    K.      Exemptions 6 and 7(C) Do Not Cover Known Identities or Official Misconduct .......... 22

    L.      The FBI Has Not Met its Burden as to Exemption 7(D). ............................................... 23

    M.      The FBI's Assertion of Exemption 7(E) Should Be Reviewed *In Camera*. ................... 24

    N.      The FBI's Assertion of Exemption 7(F) Should Be Reviewed *In Camera*. ................... 25

IV.     CONCLUSION ......................................................................................................... 25

-ii-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

**TABLE OF AUTHORITIES**

**CASES**

*ACLU N. Cal. v. U.S. DOJ*, 880 F.3d 473 (9th Cir. 2018)................................................................. 10

*ACLU of N. Cal. v. FBI*, No. 12-CV-03728-SI, 2015 WL 678231 (N.D. Cal. Feb. 17, 2015)........ 24

*ACLU v. Dep't of Def.*, 543 F.3d 59 (2d Cir. 2008) ........................................................................ 25

*ACLU v. DOJ*, 655 F.3d 1 (D.C. Cir. 2011)..................................................................................... 10

*Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983) .............................................................. 10

*Allen v. CIA*, 636 F.2d 1287 (D.C. Cir. 1980)................................................................................... 9

*Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504 (D.C. Cir. 2011) .................. 16

*Antonsen v. U.S. DOJ*, No. K-82-008, slip op. (D. Alaska Mar. 20, 1984)................................14, 15

*Apotosky v. FBI*, No. 4:15-CV-1619, 2017 WL 1093890 (N.D. Ohio Mar. 23, 2017) .................. 18

*Baker v. CIA*, 580 F.2d 664 (D.C. Cir. 1978).................................................................................. 18

*Barney v. I.R.S.*, 618 F.2d 1268 (8th Cir. 1980) .........................................................................13, 14

*Billington v. U.S. DOJ*, 233 F.3d 581 (D.C. Cir. 2000)................................................................... 24

*Birch v. USPS*, 803 F.2d 1206 (D.C. Cir. 1986)............................................................................... 8

*Bloomer v. U.S. Dep't of Homeland Sec.*, 870 F. Supp. 2d 358 (D. Vt. 2012) ............................... 18

*Cable News Network, Inc. v. FBI*, No. CV 17-1167 (JEB), 2019 WL 2408644 (D.D.C. June 7,
   2019) ............................................................................................................................................ 17

*Campbell v. U.S. DOJ*, 164 F.3d 20 (D.C. Cir. 1998) ................................................................. 9, 24

*Church of Scientology of California, Inc. v. Turner*, 662 F.2d 784 (D.C. Cir. 1980) ..................... 19

*Citizens Comm'n on Human Rights v. FDA*, No. 92-CV-5313, 1993 WL 1610471 (C.D. Cal. May
   10, 1993)....................................................................................................................................... 21

*Citizens for Responsibility & Ethics in Wash. v. U.S. DOJ*, 658 F. Supp. 2d 217 (D.D.C. 2009).. 13,
   14

*Citizens for Responsibility & Ethics in Wash. v. U.S. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014)......... 13

*Citizens for Responsibility & Ethics in Wash. v. U.S. DOJ*, 854 F.3d 675 (D.C. Cir. 2017)........... 10

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ............................... 13

*Cook v. U.S. DOJ*, No. C04-2542L, 2005 WL 2237615 (W.D. Wash. Sept. 13, 2005).............14, 15

*Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999)............................................................................. 10

*Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975) ............................................................. 1, 11

*Ctr. for Investigative Reporting v. Dep't of Labor*, 424 F. Supp. 3d 771 (N.D. Cal. 2019)............ 11

*Ctr. for Investigative Reporting v. U.S. Cust. and Border Protec.*, No. 1:18-cv-02901-BAH, 2019
   WL 7372663  (D.D.C. Dec. 31, 2019)....................................................................................20, 21

*Ctr. for Investigative Reporting v. United States Dep't of Labor*, No. 19-CV-05603-SK, 2020 WL
   3639646 (N.D. Cal. July 6, 2020)................................................................................................ 20

*Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 287 F. Supp. 3d 50 (D.D.C. 2018)....................... 10

*Davin v. U.S. DOJ*, 60 F.3d 1043 (3d Cir. 1995) ........................................................................... 24

*Dep't of Interior v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1 (2001)..................................... 22

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ................................................................ 8, 17

*Dickerson v. U.S. DOJ*, 992 F.2d 1426 (6th Cir. 1993).................................................................. 14

*Dickstein Shapiro LLP v. Dep't of Def.*, 730 F. Supp. 2d 6 (D.D.C. 2010)...................................... 9

*Dobronski v. Fed. Commc'n Comm'n*, 17 F.3d 275 (9th Cir. 1994)............................................... 23

*Ecological Rights Found. v. FEMA*, No. 16-cv-05254-MEJ, 2017 WL 5972702 (N.D. Cal., Nov.
   30, 2017)....................................................................................................................................... 11

*EFF v. U.S. DOJ*, 4:11-cv-05221-YGR, ECF No. 49 (N.D. Cal. Mar. 26, 2013) ........................... 9

*FBI v. Abramson*, 456 U.S. 615 (1982) .......................................................................................... 22

*Feshbach v. SEC*, 5 F. Supp. 2d 774 (N.D. Cal. 1997).................................................................... 24

-iii-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

*Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021 (9th Cir. 2008) ....... 23

*Freedom of the Press Foundation v. U.S. DOJ*, 241 F. Supp. 3d 986 (N.D. Cal. 2017) ............ 16, 17

*Goldberg v. U.S. Dep't of State*, 818 F.2d 71 (D.C. Cir. 1987) .................................................. 9, 15

*Hamdan v. U.S. DOJ*, 797 F.3d 759 (9th Cir. 2015) ...................................................................... 12

*Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979) ............................................................................. 9

*Hunt v. FBI*, 972 F.2d 286 (9th Cir. 1992) ..................................................................................... 11

*In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders*, 964 F.3d 1121 (D.C. Cir. 2020) ...................................................................................................................................... 20

*Johnson v. FBI*, 118 F. Supp. 3d 784 (E.D. Pa. 2015) .................................................................... 10

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93 (D.D.C. 2009) ............. 22

*King v. U.S. DOJ*, 830 F.2d 210 (D.C. Cir. 1987) .......................................................................... 17

*Kowack v. USFS*, 766 F.3d 1130 (9th Cir. 2014) ........................................................................... 22

*Labow v. U.S. DOJ*, 66 F. Supp. 3d 104 (D.D.C. 2014) ................................................................ 20

*Lahr v. NTSB*, 569 F.3d 964 (9th Cir. 2009) ................................................................................... 8

*Lane v. Dep't of the Interior*, 523 F.3d 1128 (9th Cir. 2008) ........................................................ 8

*Lawyers' Comm. For Civil Rights v. Dep't of the Treasury*, 2008 WL 4482855 (N.D. Cal. Sept. 30, 2008) .......................................................................................................................................... 22

*Manning v. U.S. DOJ*, 234 F. Supp. 3d 26 (D.D.C. 2017).............................................................. 15

*Mapother v. U.S. DOJ*, 3 F.3d 1533 (D.C. Cir. 1993) ................................................................... 14

*Martech USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993 WL 1483700 (N.D. Cal. Nov. 24, 1993). 21

*Maynard v. CIA*, 986 F.2d 547 (1st Cir. 1993) ............................................................................... 18

*Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ................... 12, 23

*Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981) ................................................... 18

*National Public Radio v. Bell*, 431 F. Supp. 509 (D.D.C. 1977) ................................................... 13

*Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16 (D.C. Cir. 1999)................. 10

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ........................................................... 13

*Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143 (9th Cir. 2008)......................................... 9, 12

*Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280 (D.C. Cir. 1983) .......................... 20, 21

*Quinon v. FBI*, 86 F.3d 1222 (D.C. Cir. 1996).................................................................................. 9

*Reporters Comm. for Freedom of the Press v. FBI*, CV 15-1392 (RJL), 2020 WL 1324397 (D.D.C. Mar. 20, 2020) ........................................................................................................................... 11

*Rosenberg v. U.S. Dep't of Def.*, 442 F. Supp. 3d 240 (2020) ....................................................... 11

*Rosenfeld v. U.S. DOJ*, 57 F.3d 803 (9th Cir. 1995) ...................................................................... 24

*Rugiero v. U.S. DOJ*, 257 F.3d 534 (6th Cir. 2001) ......................................................................... 9

*SEC v. Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir. 1980)................................................... 19

*Senate of Puerto Rico v. DOJ*, 823 F.2d 574 (D.C. Cir. 1987) ..................................................... 17

*Sierra Club Inc. v. USFWS.*, 925 F.3d 1000 (9th Cir. 2019) ......................................................... 22

*Students Against Genocide v. Dep't of State*, 257 F.3d 828 (D.C. Cir. 2001) .............................. 15

*Tokar v. U.S. DOJ*, CV 16-2410 (RC), 2019 WL 6910142 (D.D.C. Dec. 19, 2019)...................... 21

*Turner v. U.S. Dep't of the Treasury*, 2017 WL 1106030 (E.D. Cal. Mar. 23, 2017)............... 17, 20

*U.S. DOJ v. Landano*, 508 U.S. 165 (1993).................................................................................... 24

*U.S. DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989).............................. 8

*United States v. Wamang*, No. 04cr283, ECF No. 4 (D.D.C. June 16, 2004)............................. 5, 6

*United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010) ................................... 21

*Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189 (9th Cir. 2011) .................... 20

*Wiener v. FBI*, 943 F.2d 972 (9th Cir. 1991) ................................................................................ 15

*Willamette Industries, Inc. v. United States*, 689 F.2d 865 (1982)................................................. 12

*Wilner v. NSA*, 592 F.3d 60 (2d Cir. 2009) .................................................................................... 18

-iv-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ........................................................................ 11

**FEDERAL STATUTES**

18 U.S.C. § 3509 ................................................................................................................... 18
18 U.S.C. § 4111 ................................................................................................................... 14
31 U.S.C. § 5319 .............................................................................................................. 17, 20
5 U.S.C. § 552(a)(4)(B) .......................................................................................................... 9
5 U.S.C. § 552(b) ............................................................................................................ *passim*
5 U.S.C. § 552(b)(1) ........................................................................................................ 8, 15
5 U.S.C. § 552(b)(3) ............................................................................................................... 8
5 U.S.C. § 552(b)(4) ............................................................................................................... 8
5 U.S.C. § 552(b)(5) ........................................................................................................ 8, 22
5 U.S.C. § 552(b)(6) ........................................................................................................ 8, 22
5 U.S.C. § 552(b)(7) ............................................................................................................. 12
5 U.S.C. § 552(b)(7)(A) ............................................................................................... 7, 8, 12
5 U.S.C. § 552(b)(7)(C) .................................................................................................. 8, 22
5 U.S.C. § 552(b)(7)(D) .......................................................................................................... 8
5 U.S.C. § 552(b)(7)(E) .......................................................................................................... 8
5 U.S.C. § 552(b)(7)(F) .......................................................................................................... 8
50 U.S.C. § 3024(i)(1) .......................................................................................................... 18
50 U.S.C. § 3605 ................................................................................................................... 18
8 U.S.C. § 3123(d) ................................................................................................................ 19

**OTHER AUTHORITIES**

CONG. RESEARCH SERV., RL33260, PAPUA, INDONESIA: ISSUES FOR CONGRESS (2006) .................. 2
Dana Priest, *A Nightmare, and a Mystery, in the Jungle*, WASH. POST (June 22, 2003)
    https://wapo.st/3kxx6W8 .............................................................................................. 3, 4
*Defendants Walk Out as FBI Agents Testify at Timika Trial*, WIKILEAKS (Sept. 12, 2006)
    https://bit.ly/3jBv99G ....................................................................................................... 6
EBEN KIRKSEY, FREEDOM IN ENTANGLED WORLDS: WEST PAPUA AND THE ARCHITECTURE OF
    GLOBAL POWER (2012) ................................................................................................... 4, 5
Ellen Nakashima & Alan Sipress, *Indonesia Military Allegedly Talked Of Targeting Mine*, WASH.
    POST (Nov. 3, 2002) https://wapo.st/2TwumfG .................................................................... 4
FBI National Press Office, *Papuan Separatist Charged with the Murders of Two Americans,
    Attempted Murders of Others During 2002 Ambush in Indonesia* (June 24, 2004)
    https://bit.ly/3msVpVD ................................................................................................ 5, 23
GLOBAL WITNESS, PAYING FOR PROTECTION: THE FREEPORT MINE AND THE INDONESIAN SECURITY
    FORCES (July 2005) .............................................................................................................. 3
HUMAN RIGHTS WATCH, WORLD REPORT (2005) ........................................................................ 2
Jacqueline Koch, *Widow lobbies against Indonesian army*, S.F. CHRON. (June 28, 2003)
    https://bit.ly/34w72VV ........................................................................................................ 4
Jane Perlez & Raymond Bonner, *Below a Mountain of Wealth, a River of Waste*, N.Y. TIMES (Dec.
    27, 2005) https://nyti.ms/34sWGWB .................................................................................. 3
*Johnson v. Exec. Office of U.S. Attorneys*, 310 F.3d 771 (D.C. Cir. 2002) ................................. 12
Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of Exigent
    Letters and Other Informal Requests for Telephone Records*, 89-104, U.S. DEP'T OF JUSTICE
    (Jan. 2010) https://bit.ly/2HDXoaA ................................................................................ 7, 23

-v -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

Peter Gelling, *New report sheds light on 2002 Papua shooting*, N.Y. TIMES (Apr. 8, 2007) https://nyti.ms/3msNmrV ............................................................................................ 5, 7
R.M. Surachman, *"Ne bis in idem", or "double jeopardy" in Indonesia*, 73 INT'L REV. PENAL L. 1009 (2002) ............................................................................................................. 15
Raymond Bonner, *New twist in deaths of Americans in Indonesia*, N.Y. TIMES (Jan. 13, 2006) https://nyti.ms/37HHE1k .............................................................................................. 5
Raymond Bonner, *U.S. Links Indonesian Troops to Deaths of 2 Americans*, N.Y. TIMES (Jan. 30, 2003) https://nyti.ms/2HD7NU7 ............................................................................. 4
S. Eben Kirksey & Andreas Harsono, *Criminal collaborations? Antonius Wamang and the Indonesian military in Timika*, 16 S.E. ASIA RES. 165 (July 2008)....................................5, 6, 7
*Timika Trial Opens*, WIKILEAKS (July 18, 2006) https://bit.ly/36nAwEO ..................................... 5

**RULES**

Fed. R. Crim. P. 6(e)............................................................................................................... 19

**TREATISES**

9B FED. PROC., L. ED. § 22:2454................................................................................................ 15

**REGULATIONS**

Executive Order on Classified National Security Information, No. 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010) .........................................................................................................15, 16, 18

**LEGISLATIVE MATERIALS**

149 CONG. REC. E1506 (daily ed. July 15, 2003)............................................................................ 4
150 CONG. REC. E380 (daily ed. Mar. 16, 2004)............................................................................ 3
S. Hrg. 109-151, *The Nomination of Dr. Condoleezza Rice To Be Secretary of State* (Jan. 19, 2005) ............................................................................................................................ 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 14, 2021, at 9:30 a.m., or as soon thereafter as the matter may be heard in Courtroom B, located on the 15th floor of United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Ave., 94102, before the Honorable Laurel Beeler, the Plaintiff The Center for Investigative Reporting and Jonathan Jones ("CIR") will, and hereby does, oppose the motion filed by Defendant the Federal Bureau of Investigation ("FBI") and cross move the Court for an order granting for summary judgment in Plaintiff's favor.

Pursuant to Federal Rule of Civil Procedure 56, CIR respectfully asks that this Court issue an order, after reviewing the records *in camera*, requiring the government to release all records, including any necessary redactions, improperly withheld from the public under the Freedom of Information Act Exemptions 1, 3, 4, 5, 6, and 7, 5 U.S.C. § 552(b)(1), (3), (4), (5), (6), and (7).  This opposition and cross motion is based on this notice of cross motion and motion, the memorandum of points and authorities in support of this opposition and cross motion, the Declarations of Robert Blake ("Blake Decl."), Raymond Bonner ("Bonner Decl."), Jonathan Jones ("Jones Decl."), Latifah Anum Siregar ("Siregar Decl."), and attached exhibits, all papers and records on file with the Clerk or which may be submitted prior to or at the time of the hearing, and any further evidence which may be offered.

-vii -
Opp. to Def's Mot. Summ. J.; Not. of Cross Mot. and Cross Mot.
Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.

**RELIEF SOUGHT BY PLAINTIFF**

Plaintiff seeks an order dismissing Defendant's claims and granting Plaintiff's motion.

**ISSUES TO BE DETERMINED**

Did Defendant improperly withhold records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b) exemptions where information is public and segregable?

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

In this action, Plaintiff seeks the disclosure of records pertaining to an almost two-decade old criminal case involving two Americans murdered in Indonesia. The facts of this historical incident have been officially disclosed and repeatedly acknowledged: It has been widely reported on in the media, addressed in academic literature, discussed on the floor of Congress, described in released diplomatic wires, publicized by the FBI, and—most importantly—fully litigated in open court in Indonesia. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496 (1975) (holding that records are public "[o]nce true information is disclosed in public court documents"). Rather than validate the FBI's indiscriminate assertion of FOIA exemptions, the Court should conduct an *in camera* review of the requested records and order disclosure of any releasable material.

*First*, records should be released under the "public domain doctrine," which requires disclosure of any already-public information, *regardless of whether any FOIA exemptions apply*.

*Second*, even if *any* exemptions apply, all segregable information should still be disclosed. Here, the FBI estimates that it has 24,000+ responsive pages, (*see* Hardy Decl., Dkt. 16-1, ¶ 8), but only discloses 398 pages that originated from "public source material," namely media reports and government press releases, (Seidel Decl., Dkt. 42-1, ¶¶156-59), without otherwise disclosing any segregable portions. The sheer number of withheld pages belies the FBI's position on segregability.

*Third*, disclosure is also necessary because the FBI relies on insufficiently generic declarations that fail to meet FOIA's specificity requirements and do not fulfill the agency's burden of showing that Exemptions 1, 3, 4, 5, 6 and 7 apply.

*Fourth*, even if the declarations somehow met FOIA's specificity requirements, the FBI's litany of exemption claims is specious at best. Its predominant claims that the information involves

an ongoing investigation under Exemption 7 and that disclosure poses a national security risk under Exemption 1 appear especially dubious, given that the agency relinquished custody of defendant Anthonius Wamang to Indonesian authorities fourteen years ago and that a domestic trial of Mr. Wamang is legally impossible due to double jeopardy and extradition laws.  Each additional exemption claim is similarly unmeritorious, and will be taken in turn below.  Accordingly, this Court should deny the Government's motion for summary judgment and grant CIR's cross motion.

## II.    STATEMENT OF FACTS

### A.    The Subject of the Records: Anthonius Wamang and the Timika Conflict.

This case pertains to a request for records involving a 2002 attack by Anthonius Wamang that occurred in West Papua, Indonesia.  The significance of the murder is only understood within the larger geopolitical and historical circumstances, including human rights abuses against Indonesian minorities, FBI surveillance of journalists, and a massive U.S. corporate interest.

#### 1.    The West Papua Conflict and the Freeport Mine.

West Papua is an Indonesian province that comprises the "resource rich western half of the island of New Guinea."  CONG. RESEARCH SERV., RL33260, PAPUA, INDONESIA: ISSUES FOR CONGRESS 1 (2006) [hereinafter 2006 CRS REPORT].  The area, which has a majority population of indigenous Melanesian people, was under Dutch colonial rule until 1962.  *Id.* at 5.  Although West Papua's 1962 transfer to Indonesia was described as an act of "self-determination," it is estimated that "between 85% and 90% of Papuans were opposed to Indonesian rule" and that "100,000 Papuans have died as the result of Indonesian control."  *Ibid.*  Conflict between the Indonesian military ("TNI") and the largely indigenous population behind the pro-independence Free Papua Movement ("OPM") persists, with TNI responding to OPM actions with "disproportionate force" against "unarmed civilians."  HUMAN RIGHTS WATCH, WORLD REPORT 292 (2005).

West Papua is also home to Grasberg, the largest gold and second largest copper mine in the world.  2006 CRS REPORT at 7.  This mine was and continues to be operated by Freeport-McMoRan ("Freeport"), an American company.  *Ibid.*[1]  Starting in the 1970s, Freeport guarded the mine by

---

[1] Freeport then owned 91 percent of Grasberg.  2006 CRS REPORT at 7.  Now, Indonesia holds a 51 percent interest, and Freeport owns 49 percent.  Mohammed Wamique, *Indonesia closes US$3.85B Grasberg deal with Freeport-McMoRan*, S&P GLOBAL (Dec. 21, 2018) https://bit.ly/2Gs7ScP.

hiring TNI forces, "which ha[d] been fighting . . . to suppress a rebellion for Papuan independence." GLOBAL WITNESS, PAYING FOR PROTECTION: THE FREEPORT MINE AND THE INDONESIAN SECURITY FORCES 3 (July 2005).  The TNI's "close relationship [with] the mine" and hostility toward the indigenous population generated controversy around 2002.  *Ibid.*  Until then, "almost no information had been disclosed about these payments" for military protection, and concerns that these payments amounted to "extortion" caused investors to "raise[] . . . concern[s]" as to "whether such payments violate[d] the Foreign Corrupt Practices Act."  *Ibid.*  These concerns heightened following a 2002 attack that occurred on Freeport property.  *See* Jane Perlez & Raymond Bonner, *Below a Mountain of Wealth, a River of Waste*, N.Y. TIMES (Dec. 27, 2005) https://nyti.ms/34sWGWB.

## 2.    The Freeport Road Ambush.

On August 31, 2002, a group including U.S. citizens who taught the "children of Freeport's American, British and Australian employees" was ambushed on a Freeport road connecting the city of Timika to Tembagapura, a company town.  Dana Priest, *A Nightmare, and a Mystery, in the Jungle*, WASH. POST (June 22, 2003) https://wapo.st/3kxx6W8.  Freeport guarded the road with "three manned checkpoints," staffed by TNI forces.  *Ibid.*  The attack occurred "less than a half-mile away" from the Mile 64 checkpoint and lasted "approximately 45 minutes."  150 CONG. REC. E380 (daily ed. Mar. 16, 2004) (statement of Rep. Joel Hefley regarding the prevention of "Indonesia from receiving [military] funding").  "Hundreds of rounds were fired."  *Ibid.*  Two Americans, Rick Spier and Ted Burgon, were killed, as was an Indonesian, Bambang Riwanto.  *See* Priest, *supra.*

The ambush—and purported TNI involvement—quickly became a major foreign policy concern among various branches of U.S. government.  On September 2, 2002, the American embassy in Jakarta sent a cable to then-Secretary of State Colin Powell stating that many Papuan groups were calling "for an independent investigation" of the ambush, led by the United States.  (Ex. 16 to Jones Decl. at 26.)  In 2003, the Senate Foreign Relations Committee held a hearing where members discussed the "possibility of [Indonesian] military involvement in the attack" and had "a CIA analyst review[] intelligence reports on the murders, and also discuss[] intelligence indicating that military personnel were seeking to withhold evidence from FBI agents[.]"  Priest, *supra.*  In 2003, Congress openly debated withholding military aid from Indonesia, after intelligence reports supported the

Indonesian police finding that "'there [wa]s a strong possibility' that the [ambush] was perpetrated by members of the Indonesian National Army Force." *Ibid.*   The incident was officially acknowledged repeatedly.  *See ibid.*; 149 CONG. REC. E1506 (daily ed. July 15, 2003) (statement of Rep. Greg Walden) ("[E]vidence has been brought to light suggesting that members of the Indonesian military, and not a rogue band of criminals, bears responsibility for the ambush.").

Contemporaneously, several news organizations reported on the attack's political implications.  One outlet wrote that "analysts familiar with events in Papua eventually posited that TNI planned the ambush to persuade Freeport not to cut its sizable payments to the military for protection," Jacqueline Koch, *Widow lobbies against Indonesian army*, S.F. CHRON. (June 28, 2003) https://bit.ly/34w72VV, a view also taken by scholars, *see*  EBEN KIRKSEY, FREEDOM IN ENTANGLED WORLDS: WEST PAPUA AND THE ARCHITECTURE OF GLOBAL POWER 139 (2012) (positing that a "possible motive" for "Indonesian security forces [to] stage an attack near Timika . . . was extortion" and "fear[] that Freeport would end its security contracts").  But as the *Washington Post* reported, any Indonesian involvement put the United States in a difficult position, because its policy had "abruptly shifted" after the September 11, 2001 terrorist attacks and the United States needed the "Indonesian military's support in fighting al Qaeda" and other militant groups.  Priest, *supra*.

### 3.     The Surrender and Indonesian Trial of Anthonius Wamang.

Shortly after the ambush, the FBI launched an investigation that was widely known and publicized by the government.  *Ibid.*  FBI agents visited West Papua in January 2003, and "interview[ed] witnesses in the presence of Indonesian authorities[.]"  *Ibid.*  Sources, including a U.S. official, indicated that FBI agents were "investigating the possibility that [the TNI's] ambush was designed to persuade Freeport to increase its payments to the military."  *Ibud.*; *see also* Ellen Nakashima & Alan Sipress, *Indonesia Military Allegedly Talked Of Targeting Mine*, WASH. POST (Nov. 3, 2002) https://wapo.st/2TwumfG; Raymond Bonner, *U.S. Links Indonesian Troops to Deaths of 2 Americans*, N.Y. TIMES (Jan. 30, 2003) https://nyti.ms/2HD7NU7 ("Bush administration officials have determined that Indonesian soldiers carried out a deadly ambush that killed two American teachers.").  A Papuan human rights group, Elsham, also offered evidence "of Indonesian military involvement."  KIRKSEY, *supra*, at 140.

Despite public acknowledgment of TNI involvement by members of Congress and agency officials, the FBI began to downplay this theory at some point in 2003.  *Id.* at 141.  On June 24, 2004, the FBI issued a press release announcing that "a joint U.S.-Indonesian investigation has led to the indictment of Indonesian citizen Anthonius Wamang in connection with the deadly attack in August 2002" and described Mr. Wamang as an OPM "operational commander."  FBI National Press Office, *Papuan Separatist Charged with the Murders of Two Americans, Attempted Murders of Others During 2002 Ambush in Indonesia* (June 24, 2004) https://bit.ly/3msVpVD; *see also United States v. Wamang*, No. 04cr283, ECF No. 4 (D.D.C. June 16, 2004) (unsealed indictment).

At the time of his indictment, the FBI lacked custody of Mr. Wamang, despite having met with him prior.  Mr. Wamang had "voluntarily agreed to meet with FBI agent Ronald C. Eowan on August 12, 2003" in West Papua.  Kirksey, *supra*, at 159.  Although Mr. Wamang admitted he was involved in the ambush, he also said that TNI sold him arms and that he saw a TNI vehicle with "Indonesian soldiers shooting—like they were competing."  *Ibid.*[2]  The FBI did not take Mr. Wamang into custody at this point.  *See* Kirksey & Harsono, *supra*, at 194.  On January 11, 2006, another voluntary meeting between Mr. Wamang and two FBI agents was brokered, during which "the FBI pledged to transport [Mr. Wamang] to the USA for trial," which Mr. Wamang preferred.  *Ibid.* (describing witness accounts).  But instead of taking him to the United States, the FBI promptly "turned over" Mr. Wamang and eleven other suspects to the Indonesian police.  Raymond Bonner, *New twist in deaths of Americans in Indonesia*, N.Y. Times (Jan. 13, 2006) https://nyti.ms/37HHE1k.

In 2006, Mr. Wamang underwent trial, "which was open to the public," by Indonesia's Central Jakarta District Court.  Peter Gelling, *New report sheds light on 2002 Papua shooting*, N.Y. Times (Apr. 8, 2007) https://nyti.ms/3msNmrV.  Four Indonesian soldiers testified, *ibid.*, as did at least two co-conspirators, Agustinus Anggaibak and Rev. Isak Onawame, according to a now-public State Department cable, *Timika Trial Opens*, WikiLeaks (July 18, 2006) https://bit.ly/36nAwEO.  FBI Agents Ronald Eowan and Paul Myers also testified, "introduc[ing] several videos" and images of the "weapons believed to have been used in the attack" as evidence and describing meetings at

---

[2] In a peer-reviewed article, human rights researchers explained that TNI agents may have "help[ed] Wamang stage [an] attack."  S. Eben Kirksey & Andreas Harsono, *Criminal collaborations? Antonius Wamang and the Indonesian military in Timika*, 16 S.E. Asia Res. 165 (July 2008).

which "defendants confessed their roles in the attack," as later documented by the U.S. Embassy in Jakarta. *Defendants Walk Out as FBI Agents Testify at Timika Trial*, WIKILEAKS (Sept. 12, 2006) https://bit.ly/3jBv99G. Mr. Wamang was found guilty and, on November 7, 2006, sentenced to life in prison. Kirksey & Harsono, *supra*, at 195. Mr. Wamang appealed, but the Jakarta High Court upheld his life sentence on March 7, 2007. (Siregar Decl. ¶ 6.) To date, Mr. Wamang has exhausted his appeals as a matter of right. *Ibid.* He remains at Timika Prison, where he recently confirmed that the FBI has not contacted him or any of his attorneys since his 2006 arrest. (*Id.* ¶ 9.)

Since the Government began its federal prosecution of Mr. Wamang in 2004, little activity has occurred in his case—save for the Government's own motion to *unseal* the indictment on the grounds that it intended to publicly disclose the information and that this disclosure would not endanger FBI agents. *See United States v. Wamang*, No. 04cr283, ECF No. 3 at 1 (D.D.C. June 23, 2020). Since this unsealing, the Government has only appeared at routine fugitive calendar calls, requesting that the "bench warrant remain outstanding" without offering further elaboration as to the ultimate likelihood of prosecution. *See, e.g.*, *id.*, Transcript of Proceedings (D.D.C. Aug. 8, 2020). It has done so without noting that the absence of an extradition treaty with Indonesia, *see ibid.*, which renders Mr. Wamang's prosecution in the United States highly "unlikely to occur," according to a former U.S. Ambassador to Indonesia. (Blake Decl. ¶¶ 9, 10.)

### 4. Continued Concerns as to TNI Involvement and FBI Wrongdoing.

Public acknowledgment of the case and TNI involvement in the ambush continued even after Mr. Wamang became the focus of American and Indonesian investigations. At a 2005 confirmation hearing of Secretary of State Condoleezza Rice, then-Senator Joe Biden noted that "[i]nitial reports, by both Indonesian police and the State Department, implicated the Indonesian military in the attack" and suggested that Attorney General John Ashcroft "downplayed" the TNI connection by "shift[ing] the blame to an alternate suspect." S. Hrg. 109-151, *The Nomination of Dr. Condoleezza Rice To Be Secretary of State*, 252 (Jan. 19, 2005). While asserting that the FBI did not uncover evidence of TNI involvement, Secretary Rice stressed America's interest in providing them military aid. *Ibid.*[3]

---

[3] Contemporaneously, the Papuan human rights group Elsham circulated a memo that year to members of Congress, affirming that it had "provided the FBI with specific evidence of TNI involvement." (Ex. 1 to Jones Decl. at 1.) Human rights researchers continued to question whether

-6-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT. SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

1    The press also continued to report on the case and TNI involvement, *see* Gelling, *supra*, and,

2   unwittingly, became part of the FBI's investigation due to this reporting.  In 2008, it became evident

3   that the FBI had "unlawfully obtained" the telephone records of journalists, including Raymond

4   Bonner, who had quoted a U.S. government official stating that a link existed between TNI and the

5   Timika ambush.  (Bonner Decl. ¶ 16); *see generally* Office of the Inspector General, *A Review of the*

6   *Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone*

7   *Records*, 89-104, U.S. DEP'T OF JUSTICE (Jan. 2010) https://bit.ly/2HDXoaA [hereinafter "OIG

8   Report"].  This action led the Office of the Inspector General to conclude that, in obtaining these

9   records, the FBI was "negligent in various respects," and engaged in a "serious abuse of [its]

10  authority."  OIG Report, *supra*, at 102, 104.  Then-FBI Director Robert Mueller acknowledged this

11  misconduct, calling the *New York Times* to "express regret that the FBI agents had not followed

12  proper procedures."  *Id.* at 102. The FBI's General Counsel, Valerie Caproni, also sent Mr. Bonner

13  a letter regretting that "required procedures" were not followed.  (Bonner Decl. ¶ 18.)

14       **B.     CIR's FOIA Request, the FBI's Response, and Subsequent Litigation History.**

15       On November 30, 2015, Jonathan Jones, who is a reporter for Plaintiff, The Center for

16  Investigative Reporting, submitted a FOIA request seeking, among other things, "[a]ll records . . .

17  concerning the death" of Mr. Spier and Mr. Burgon and "all records relating to the Indonesian citizen,

18  Anthonius Wamang, in connection to the attack on August 31, 2002." (Dkt. 1-2, Ex. A at 1.)

19       On January 4, 2016, the FBI provided a "*Glomar* response," stating that it would neither

20  confirm nor deny the existence of the records, and informed Plaintiff that proof of death was

21  necessary.  (*Id.*, Ex. B.)  On January 8, 2016, Plaintiff responded with an FBI press release on the

22  murders of Mr. Spier and Mr. Burgon.  (*Id.*, Ex. D.)  On December 3, 2018, Plaintiff learned that the

23  FBI had closed the request for lack of proof of death.  Plaintiff replied that proof had been timely

24  provided, prompting the FBI to reopen the request.  (*See id.*, Ex. E.)  On February 12, 2019, the FBI

25  issued a final determination letter, invoking FOIA Exemption 7(A) and closing Plaintiff's request.

26  (*See id.*, Ex. F.)  Plaintiff administratively appealed on March 11, 2019, (*see id.*, Ex. G), and on July

27

28  "Bush Administration officials help[ed] cover up evidence of Indonesian military involvement so
    that they could pursue objectives in the war on terror."  Kirksey & Harsono, *supra*, at 165.

29, 2019, the DOJ Office of Information Policy rejected this challenge on modified grounds, additionally invoking Exemption 7(C) to protect Mr. Wamang's personal privacy. (*See id.*, Ex. H.)[4]

On August 5, 2019, CIR brought this action. On December 11, 2019, the FBI moved to bifurcate the proceeding, so as "to assert . . . Exemption 7(A)" in an initial phase, while preserving all other not-yet-specified exemptions. (Dkt. 16 at 2.) On January 23, 2020, the Court denied the FBI's bifurcation motion, but did not require it to produce a *Vaughn* index at that time. (*See* Dkt. 23 at 4.) On September 18, 2020, the FBI moved for summary judgment, "asserting Exemption (b)(7)(A) to categorically withhold the records" and Exemptions (b)(7)(C) and (b)(7)(E) as to an unquantified portion of these records. (Gov. Br., Dkt. 42, at 2.) It also invoked Exemptions (b)(1), (b)(3), (b)(4), (b)(5), (b)(6), (b)(7)(D), and (b)(7)(F) for the first time. *See ibid.* CIR now cross moves for summary judgment. Of the 24,400+ responsive pages and 47 hours of media it possesses, (Hardy Decl. ¶ 8), the FBI has produced only 398 pages and 51 minutes of media, all exclusively culled from public source materials, (Seidel Decl. ¶ 44). No other segregable portions have been released.

## III.   ARGUMENT

### A.   FOIA Establishes a Presumption of Disclosure, and the Government Bears the Burden of Proving that Withheld Records are Clearly Exempt.

FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless information is exempt[] under clearly delineated statutory language." *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976) (citations and quotations omitted). FOIA exemptions are interpreted narrowly. *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009). The agency "bears the burden of demonstrating that the exemption properly applies," *id.*, and must show more than "substantial evidence[,]" *U.S. DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). Rather, the agency must demonstrate that withheld information is "clearly exempt," *Birch v. USPS*, 803 F.2d 1206, 1209 (D.C. Cir. 1986) (quotation and citation omitted). Although the agency may meet its burden by providing clear, factual, and specific declarations, *Lane v. Dep't of the Interior*, 523 F.3d 1128, 1135–36 (9th Cir. 2008), conclusory and generalized allegations are insufficient.

---

[4] The FBI appears to have waived this exemption as to Mr. Wamang.

FOIA claims are reviewed *de novo* by the court.  *Hayden v. NSA*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).  While courts must provide some deference to agency expertise, *id.*, "deference is not equivalent to acquiescence," *Campbell v. U.S. DOJ*, 164 F.3d 20, 30 (D.C. Cir. 1998).

Here, the Government fails to meet its burden to show any claimed exemptions apply, as its declarations, while lengthy, are replete with generalized and conclusory language.

**B.** ***In Camera* Review is Necessary Because the FBI Offers Only General Descriptions of the Withheld Records.**

FOIA specifically authorizes *in camera* inspection, *see* 5 U.S.C. § 552(a)(4)(B), and district courts have broad discretion exercising this power, *see Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1150 (9th Cir. 2008) (stating *in camera* review is "'appropriate and perhaps necessary'").  Such review is especially appropriate where: (1) "agency affidavits merely parrot the language of the statute and are drawn in conclusory terms," *Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980), (2) evidence suggests the agency did not act in good faith, *Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996) and (3) there is strong "public[] interest in disclosure," *Rugiero v. U.S. DOJ*, 257 F.3d 534, 543 (6th Cir. 2001).  Even in the national security context, courts must not "relinquish[] their independent responsibility" to review an agency's withholdings.  *Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987).  In cases involving many records, courts may request that a smaller sample of documents be submitted for *in camera* inspection for purposes of judicial economy.  *See, e.g.*, *Dickstein Shapiro LLP v. Dep't of Def.*, 730 F. Supp. 2d 6, 10 (D.D.C. 2010).

Here, *in camera* review is necessary because the FBI largely supports its motion through Mr. Seidel's ambling and ultimately generic declaration, which merely parrots FOIA's language with no specificity to justify withholding.  Furthermore, *in camera* review is especially appropriate here because the FBI committed wrongdoing in the underlying activities and now improbably claims that all 24,000+ withheld pages are "so replete with . . . intelligence [information]" that no portions can be segregated and produced.  *See, e.g.*, *EFF v. U.S. DOJ*, 4:11-cv-05221-YGR, ECF No. 49, 2–3 (N.D. Cal. Mar. 26, 2013).  Further, the public interest in the matter also demands *in camera* review.

**C.      The FBI Improperly Withholds Information Already in the Public Domain.**

Under the "public domain doctrine," material that is "ordinarily exempt" from disclosure may no longer be withheld if already public. *See, e.g.*, *ACLU N. Cal. v. U.S. DOJ*, 880 F.3d 473, 491 (9th Cir. 2018) (quoting *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)).  In such cases, once the requester shows that the information is public, the burden shifts to the government to "rebut the plaintiff's proof" by demonstrating that the information "has been removed from the public domain." *Cottone*, 193 F.3d at 556.  Applying this test, multiple courts have held that publicity spoils the claims of various exemptions, including Exemptions 1, 3, 4, 5, 6 and 7, as alleged here.  *See, e.g.*, *ACLU N. Cal.*, 880 F.3d at 491 (Exemption 5); *Citizens for Responsibility & Ethics in Wash. v. U.S. DOJ*, 854 F.3d 675, 683 (D.C. Cir. 2017) (Exemptions 6 and 7(C) concerning publicly identified individuals); *ACLU v. U.S. DOJ*, 655 F.3d 1 (D.C. Cir. 2011) (Exemptions 6 and 7(C)); *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) (Exemption 4); *Afshar v. Dep't of State*, 702 F.2d 1125, 1130–34 (D.C. Cir. 1983) (Exemptions 1 and 3).

In those and other cases, courts applying the public domain doctrine have disclosed records at least as sensitive as those at issue here.  For instance, *Cottone* concluded that publicity of wiretapped conversations procured by undercover agents in connection to a mafia drug trade investigation made Exemptions 3 and 7 inapplicable.  193 F.3d at 552–57 (deeming records lost "their protective cloak"); *see also Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 287 F. Supp. 3d 50, 56, 63–69 (D.D.C. 2018) (ordering production of a memorandum sent to the Secretary involving investigations of a nuclear facility); *Johnson v. FBI*, 118 F. Supp. 3d 784, 789, 795 (E.D. Pa. 2015) (ordering FBI to release an investigative file).  And just recently, this Circuit determined that information about DOJ's electronic surveillance and tracking devices in criminal investigations was subject to disclosure under the doctrine.  *See ACLU N. Cal.*, 880 F.3d at 485–91.

Here, the public domain doctrine clearly applies, as much of the requested information has been disclosed.  The underlying information has been made public by many news outlets across the globe, acknowledged by multiple public officials in Congress, and addressed in now-public State Department wires. Especially fatal to the FBI's full withholding of records, Mr. Wamang's case has

been fully prosecuted in an open court of law in Indonesia.[5]  Indeed, at that trial, multiple witnesses—including FBI agents—were called to the stand to testify, and evidence was presented, including a possible murder weapon.  Any and all of this information is therefore presumptively public, and subject to the public domain doctrine.  Moreover, to the extent that the FBI is concerned with the fact that the records could disclose TNI involvement in the 2002 incident, that fact has already been officially acknowledged by members of Congress and others, as described *supra*.  *See Wolf v. CIA,* 473 F.3d 370, 378 (D.C. Cir. 2007) ("[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." (citation omitted)).  And to the extent the FBI wishes to refrain from sharing its own possible change of position on that matter, that, too, is well-documented.  *See* Section II.4; *see also Hunt v. FBI,* 972 F.2d 286, 289–90 (9th Cir. 1992) (recognizing "that the public interest in ensuring the integrity and the reliability of government investigation procedures is greater where there is some evidence of wrongdoing on the part of the government official").

### D.  FBI Must Disclose Information Under the Foreseeable Harm Standard.

In 2016, the OPEN FOIA Amendment added heightened requirements for withholding.  5 U.S.C. § 552(a)(8)(A).  This objective standard requires an agency to show 1) that a foreseeable harm will result from disclosure, and 2) that the harm will result to an interest relevant to the cited exemption.  *Reporters Comm. for Freedom of the Press v. FBI*, 15-cv-1392-RJL, 2020 WL 1324397, at *8 (D.D.C. Mar. 20, 2020).  "Generic, across-the-board articulations of harm . . . and boilerplate, nebulous articulations of harm are insufficient."  *Rosenberg v. U.S. Dep't of Def.*, 442 F. Supp. 3d 240, 259 (D.D.C. 2020).  Indeed, this and other courts have concluded that failure to satisfy the foreseeable harm standard is fatal to several Exemptions.  *See, e.g.*, *Ecological Rights Found. v. FEMA*, No. 16-cv-05254-MEJ, 2017 WL 5972702, at *6 (N.D. Cal., Nov. 30, 2017) (documents must be disclosed absent foreseeable harm showing); *Ctr. for Investigative Reporting v. Dep't of Labor*, 424 F. Supp. 3d 771, 780 (N.D. Cal. 2019) (same, where information *mostly* public).

Here, the FBI, is unable to show that disclosure will cause any foreseeable harm, particularly with regard to public domain information.  *See supra* Section III.C.

---

[5] It is a well-established tenet of First Amendment law that information made public during a judicial proceeding cannot go back into the proverbial bottle.  *See Cox Broad. Corp.*, 420 U.S. at 496.

1

**E.      FOIA Requires Portions of the Records To Be Reasonably Segregated.**

2

3        FOIA states that any "reasonably segregable portion of a record shall be provided to any

4    person." 5 U.S.C. § 552(b).  Thus, it is reversible error for a court "to simply approve the withholding

5    of an entire document without entering a finding on segregability," as agencies have a "duty to

6    segregate" and provide releasable information through redaction even where records contain exempt

7    information.  *Hamdan v. U.S. DOJ*, 797 F.3d 759, 779 (9th Cir. 2015); *see also Willamette Industries,*

8    *Inc. v. United States*, 689 F.2d 865, 867 (1982) ("[T]he agency cannot justify withholding an entire

9    document simply by showing that it contains some exempt material.").  The burden is on the agency

     to show that it has disclosed all reasonably segregable portions.  *Pac. Fisheries*, 539 F.3d at 1148.

10

11       Here, the FBI has failed to carry its burden of explaining—let alone with specificity—why it

12   is categorically withholding thousands of pages in full.[6]  In its prolix 66-page declaration, the FBI

13   flatly states that Plaintiff's request has been "denied in its entirety," apart from a minute number of

14   news reports and press releases.  (Seidel Decl. ¶ 59).  The FBI makes no effort to explain how

15   disclosable material, such as the Indonesian court records, is so "inextricably intertwined with

16   exempt portions" that categorical withholding is justified.  *Mead Data Ctr., Inc. v. U.S. Dep't of Air*

17   *Force*, 566 F.2d 242, 260 (D.C. Cir. 1977); *see also Johnson v. Exec. Office of U.S. Attorneys*, 310

18   F.3d 771, 776 (D.C. Cir. 2002) ("the agency must provide a 'detailed justification' for its non-

19   segregability").  Indeed, the FBI spends but one paragraph on this crucial issue in its brief, implying

20   that the work-product doctrine covers all the content, so no segregability analysis is required.  (Gov.

21   Br. at 32).  That is wrong, and such cursory language fails to meet the burden set out in this and all

     other Circuits.  Thus, segregable portions must be released.

22

**F.      The FBI Has Improperly Withheld Records Under Exemption 7(A) Because There is No Possibility of Prosecution.**

23

24       Under Exemption 7(A), "records or information compiled for law enforcement purposes," 5

25   U.S.C. § 552(b)(7),[7] may be withheld "only to the extent that the production . . . could reasonably be

26   expected to interfere with enforcement proceedings," *id.* § 552(b)(7)(A).  "The applicability of

27   ────────────────
     [6] While the FBI previously estimated 24,400 pages were responsive, the agency now omits the
28   number of pages at issue.  (*See generally* Seidel Decl.)  In light of this vagueness and because even
     more records may be at issue, CIR reserves its right to challenge the adequacy of the FBI's search.
     [7] CIR concedes that most, if not all, of the records were "compiled for law enforcement purposes."

Exemption 7(A) involves a two-step analysis: (1) whether a law enforcement proceeding is pending or prospective; and (2) whether release of information about it could reasonably be expected to cause some articulable harm." *Citizens for Responsibility & Ethics in Wash. v. U.S. DOJ*, 658 F. Supp. 2d 217, 225–26 (D.D.C. 2009) (internal citation omitted).  Even if the disputed records were to contain some information properly withheld under Exemption 7(A), the agency still must segregate and disclose all non-exempt information from those records.  *See* 5 U.S.C. § 552(b).

     The FBI does not and cannot show that a concrete law enforcement proceeding is pending.  Courts have repeatedly held that the government "cannot rely on hypothetical future proceedings" for Exemption 7(A).  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 235 (1978) (internal citation omitted).  In *Robbins Tire*, the Supreme Court explained that Exemption 7 does not "endlessly protect material simply because it was in an investigatory file." *Id.* at 230.  Instead, the government must show "a *concrete* prospective law enforcement proceeding." *Id.* (emphasis added).  Here, the Government does not and cannot do any such thing for four reasons.

     *First*, the FBI abandoned its interest in this case years ago, and this significant "passage of time" leans in favor of finding 7(A) does not apply.  *Citizens for Responsibility & Ethics in Wash. v. U.S. DOJ*, 746 F.3d 1082, 1098 (D.C. Cir. 2014) (hereinafter "CREW") (passage of "30 months" leaned in favor of finding no ongoing investigation); *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 870 (D.C. Cir. 1980) ("There is no reason to protect yellowing documents contained in long-closed files.").  Although the FBI does not mention this fact in its brief, Mr. Wamang surrendered to the FBI in 2006, having received "the agency's assurances that he would face trial in the United States, which Mr. Wamang preferred."  (Siregar Decl. ¶ 4.)  But after bringing Mr. Wamang into its custody under assertedly false pretenses, the FBI turned him over to Indonesian authorities.  *See Barney v. I.R.S.*, 618 F.2d 1268, 1273–74 (8th Cir. 1980) ("[O]nce enforcement proceedings are . . . abandoned, exemption 7(A) will likely no longer apply to prevent disclosure.").  The Government cannot now brazenly claim that it intends to prosecute Mr. Wamang when it declined the opportunity to bring him to justice in the United States fourteen years ago.[8]

---

[8] The FBI cites easily distinguishable cases for the proposition that "Exemption (b)(7)(A) applies to long-term or dormant investigations."  ECF No. 42 at 12.  In *National Public Radio v. Bell*, 431 F. Supp. 509, 510 (D.D.C. 1977), the requested records concerned a recent death on U.S. soil.  In its

-13-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

*Second*, Mr. Wamang was already tried, convicted, and sentenced to life imprisonment by an Indonesian court.  (*See* Siregar Decl. ¶¶ 5, 6.)  He has exhausted his appeals as of right, and he remains in detention in Timika.  *See Barney*, 618 F.2d at 1273–74 (explaining that Exemption 7(A) "will likely no longer apply" to records "once enforcement proceedings are concluded"); *Antonsen v. U.S. DOJ*, No. K-82-008, slip op. at 9–10 (D. Alaska Mar. 20, 1984) ("It is difficult to conceive how the disclosure of these materials could have interfered with any enforcement proceedings" after criminal defendant had been tried and convicted.).

*Third*, even if, assuming *arguendo*, Mr. Wamang could be released from Indonesian custody, the FBI cannot show that any prosecution in the United States is "reasonably anticipated" in the United States because of two legal impossibilities.  *Mapother v. U.S. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993); *see also CREW*, 658 F. Supp.2d at 228–29 (DOJ did not meet its 7(A) burden when it failed to "describe with any reasonable degree of particularity . . . *when* such [hypothetical] proceedings might occur") (emphasis added).  As an initial matter, the possibility of a trial assumes that the FBI would be able to obtain custody of Mr. Wamang, but such an assumption is unreasonable because the United States lacks an extradition treaty with Indonesia and would thus be unable to bring Mr. Wamang into its territorial jurisdiction.  (*See* Blake Decl. ¶ 9; Siregar Decl. ¶ 7.)  Indeed, Indonesian law expressly "prohibits extradition of Indonesian nationals to any country," except if the crime took place in the extraditing forum.  (Siregar Decl. ¶ 7 (quoting Law of the Republic of Indonesia, No. 1, art. 7(1)-(2)).)  Because the relevant crime occurred in Indonesia, no exception is applicable, and it is legally impossible for the FBI to obtain custody of Mr. Wamang.

Moreover, even if the FBI obtained Mr. Wamang, any law enforcement proceeding against him is statutorily barred by 18 U.S.C. § 4111, regardless of whether such a proceeding comports with the constitutional rule on double jeopardy, (*see* Maisel Decl., Dkt. 42-2, ¶ 5).  Section 4111 "requires that a transfer of an offender from a foreign country to the United States be analyzed as if it were a

---

ruling for the Government, the court nonetheless noted that withholding should not occur where an enforcement proceeding is "merely 'conceivable,'" because Exemption 7(A) was narrowed to discourage its invocation after the "prospect of prosecution had passed." *Id*. at 515 n.14 (cleaned up).  Likewise, *Dickerson v. U.S. DOJ*, 992 F.2d 1426 (6th Cir. 1993), and *Cook v. U.S. DOJ*, No. C04-2542L, 2005 WL 2237615 (W.D. Wash. Sept. 13, 2005), involved domestic incidents with no publicly identifiable subject, let alone a suspect who surrendered himself and withstood trial.

transfer between two United States federal courts, not two different sovereigns," and so it "provides the offender with the same protection against double jeopardy" by statute.  9B FED. PROC., L. ED. § 22:2454.  As Article 76 of Indonesia's Penal Code provides that "no person may be prosecuted twice for an act for which a final judgment has been rendered by a judge in Indonesia," *see* R.M. Surachman, *"*Ne bis in idem*", or "double jeopardy" in Indonesia*, 73 INT'L REV. PENAL L. 1009 (2002) (providing translation), Section 4111 would apply to Mr. Wamang, and bars further action.

Finally, even if the FBI could show that a future proceeding of Wamang is somehow "concrete" or reasonably possible, it may not use Exemption 7(A) to categorically withhold information that was already made public by Mr. Wamang's full and open trial in Indonesian court. *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001); *compare Antonsen*, No. K-82-008, Slip Op. at 9–10 (Exemption 7 didn't apply after criminal defendant had been tried and convicted), *with Manning v. U.S. DOJ*, 234 F. Supp. 3d 26, 37 (D.D.C. 2017) (FBI met its burden because no cases had been tried).[9]

## G.        Exemption 1 Does Not Apply Because the FBI Does Not Satisfy EO 13,256.

Pursuant to Exemption 1, information may be withheld if its classification has been "specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy" and is "in fact properly classified pursuant to such Executive Order," both procedurally and substantively.  5 U.S.C. § 552(b)(1); *see also Goldberg*, 818 F.2d at 77.  Under the relevant Executive Order ("EO") on Classified National Security Information, No. 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010), "[n]o information may remain classified indefinitely."  Classification is proper only if "the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security."  *Id.* § 1.1(a)(4).  An agency must do more than offer a categorical recitation of an executive order's language or "'boilerplate' explanations" for withholding.  *Wiener v. FBI*, 943 F.2d 972, 978 (9th Cir. 1991).  Here, the FBI wholly fails to fulfill EO 13,526's substantive[10] criteria.

---

[9] In the event the Court has concerns that Exemption 7(A) applies, it should follow the approach in *Cook*, which the FBI cites, and conduct "*in camera* review of the requested documents so" as to "ascertain how [] disclosure would affect the enforcement proceedings."  2005 WL 2237615, at *1.
[10] In addition to the substantive failures, the FBI's Exemption 1 claim may be procedurally flawed. Under EO 13,256, a narrow category of officials has the authority to declassify information: (1) the

EO 13,526 §1.1(4) permits classification only if (1) "disclosure of the information reasonably could be expected to result in damage to the national security" and (2) "the original classification authority is able to identify or describe the damage."  Here, the FBI gives no plausible explanation as to how releasing information related to an eighteen-year-old incident—that was already subject to a public trial, where many intelligence sources and methods were already disclosed—could reasonably be expected to damage national security.  The FBI also provides no reasonable description of the purported damage.  Instead, the agency attempts to skirt both requirements by citing to a single case, *Freedom of the Press Foundation v. U.S. DOJ*, 241 F. Supp. 3d 986, 998 (N.D. Cal. 2017) (hereinafter "*FPF*"), for the inapposite proposition that "it is conceivable that the mere explanation of why information must be withheld can convey valuable information to a foreign intelligence agency." (*See* Gov. Br. at 16.)  But *FPF* is starkly distinguishable.

First, the declaration in *FPF* "explain[ed] the *specific rationale* for withholding the relevant seven pages," "in addition to describing the general justifications for shielding" the disclosure," 241 F. Supp. 3d at 998 (emphasis added), whereas here, the FBI has not provided even a general justification for how damage to national security could reasonably be expected to result from disclosure of historical records.  And, in contrast to the records in *FPF*, much of the intelligence information at issue here has already been made public in open court, and thus cannot cause injury, *see Ancient Coin Collectors Guild v. U.S. Dep't of Stat*e, 641 F.3d 504, 509 (D.C. Cir. 2011) (rejecting Exemption 1 claims of national security risk where information is public).

Second, *FPF* held that a national security risk was possible because the 7-pages describing surveillance methods, were *contemporaneously*-used by the FBI.  241 F. Supp. 3d at 998 (stating the procedures "are *still used* by the FBI today to gather information") (emphasis added).  Here, the requested *historical* records are likely to contain thousands of pages of outdated facts.  *See King v.*

---

President and the Vice President; (2) agency heads and officials *designated* by the *President*; and (3) U.S. Government officials delegated this authority "in writing."  Although Mr. Seidel states that he "personally and independently" examined the Exemption 1 material, (*See* Seidel Decl. ¶ 156; Gov. Br. at 16), and that he has been "*designated* by the *Attorney General* of the United States as [having] an original classification authority," (Seidel Decl. ¶ 2), that designation may only be made by the *President* or made in "writing"—neither of which is presented here. *See Wickwire Gavin, P.C. v. Def. Intelligence Agency*, 330 F. Supp. 2d 592, 601 (E.D. Va. 2004).

1    *U.S. DOJ*, 830 F.2d 210, 226 (D.C. Cir. 1987) ("In reviewing the FBI's predictions on disclosure,

2    the court should devote particular attention to the age of the file[.]").

3        Third, unlike *FPF*, in which the agency "further elaborate[d]" a specific national security

4    injury that could occur, *see* 241 F. Supp. 3d at 998, the FBI in this case has not reasonably described

5    the anticipated damage.  Instead, the situation here closely resembles *Cable News Network, Inc. v.*

6    *FBI*, where the court rejected an Exemption 1 claim because the FBI "provided no line of reasoning

7    linking the disclosure of these redactions to any harm" to foreign relations or national security and

8    held that agencies "must offer a rationale that is logical or plausible," rather than simply stating that

9    a harm will ensue.  No. CV 17-1167 (JEB), 2019 WL 2408644, at *9 (D.D.C. June 7, 2019).

10       Given these failures, Exemption 1 does not justify withholding.

11   **H.    The FBI Incorrectly Withholds Records Under a Sweeping Interpretation of
             Exemption 3 and Provides Inadequate Support for Its Assertions.**

12

13       Exemption 3 allows an agency to withhold information "*specifically exempted* from

14   disclosure by statute," but only if the statute "(i) requires that the matters be withheld from the public

15   in such a manner as to leave *no discretion* on the issue; or (ii) establishes *particular criteria* for

16   withholding or refers to *particular types of matters* to be withheld."  5 U.S.C. § 552(b)(3) (emphases

17   added).[11]  While a statute may permit agencies to withhold records that fall within a statute's ambit,

18   such an exemption must be construed narrowly, given FOIA's "dominant objective" of "disclosure,

19   not secrecy."  *Rose*, 425 U.S. at 361.  Accordingly, courts have generally refused to draw expansive

20   "veil[s] of secrecy" covering all records connected to a withholding statute.  *Senate of Puerto Rico*

21   *v. U.S. DOJ*, 823 F.2d 574, 582 (D.C. Cir. 1987).  Moreover, "the court must be able to [clearly]

22   determine from the defendant's declarations whether there were reasonably segregable portions of

23   documents subject to Exemption 3 that were nonetheless releasable."  *Turner v. U.S. Dep't of the*

24   *Treasury*, 2017 WL 1106030, at *7 n.9 (E.D. Cal. Mar. 23, 2017).

25

26   _____

27   [11] Exemption 3 also requires the withholding statute "if enacted after the date of enactment of the
     OPEN FOIA Act of 2009, [to] specifically cite[] to this paragraph" of 5 U.S.C. § 552(b)(3).  CIR

28   contests the satisfaction of this requirement only as to the Bank Secrecy Act.  In 2011, Congress
     amended this statute to provide that covered reports "may not be disclosed under any . . . 'freedom
     of information' [act]," 31 U.S.C. § 5319 but failed to "specifically cite" to Exemption 3, as required.

-17-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

Here, the FBI attempts to withhold an untold number of pages under five statutes, but fails to carry its burden as to any of them.  The FBI does not address any of the requirements of the Exemption 3 statutes in its brief, relying entirely on the lengthier but similarly vague Seidel Declaration.  (*See* Gov. Br. at 24.)  Critically, neither the brief nor the declaration identifies a single type of document that is "specifically exempt" under each of the four statutes, nor do they attempt to explain *why* wholesale withholding is justified.  *See Wilner v. NSA*, 592 F.3d 60, 72 (2d Cir. 2009) ("Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue [is] the inclusion of the withheld material within the statute's coverage.")  Although it is true that some of the cited statutes qualify as Exemption 3 statutes, the FBI asserts them so broadly as to improperly create a "veil of secrecy." *Bloomer v. U.S. Dep't of Homeland Sec.*, 870 F. Supp. 2d 358, 365 (D. Vt. 2012).

First, the FBI asserts the Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509, as to an unspecified number of records.  But the FBI's cursory declaration fails to "indicate[] how [Exemption 3] is applied and to which of plaintiff's documents it was applied," as it has done in other cases.  *Apotosky v. FBI*, No. 4:15-CV-1619, 2017 WL 1093890, at *7 (N.D. Ohio Mar. 23, 2017).  It has thus failed to carry its Exemption 3 burden as to this statute.[12]

Second, the FBI wrongly withholds records under the National Security Act ("NSA"), 50 U.S.C. § 3024(i)(1), which "protect[s] intelligence sources and methods from unauthorized disclosure."[13]  By the NSA's explicit terms, withheld information must relate to the "organization," "functions," or "activities" of the National Security Agency—not another Agency or nongovernmental entity.  *Id.* § 3605.  Moreover, as with other national security statutes, the NSA does not apply to *all* records related to intelligence sources and methods.  *See, e.g.*, *Baker v. CIA*, 580 F.2d 664, 670 (D.C. Cir. 1978) (stating its analog, the CIA Act "creates a very narrow and explicit exception" to FOIA where "[o]nly the *specific information*" is protected (emphasis added)).

---

[12] Although CIR will not belabor the point, this problem afflicts all of the Exemption 3 claims.

[13] Courts have uniformly held that the category of information protected by EO 13,526 § 1.4(c) through Exemption 1 is co-extensive with the category of intelligence sources and methods in the National Security Act, which is protected by Exemption 3.  *See Military Audit Project v. Casey*, 656 F.2d 724, 736 n.39 (D.C. Cir. 1981).  When Exemptions 1 and 3 are claimed on these bases, the reviewing standard is essentially the same.  *Maynard v. CIA*, 986 F.2d 547, 555 (1st Cir. 1993).

Here, it is unclear whether any of the records relate to the National Security Agency or how they relate to unknown intelligence sources and methods. In any event, it is unlikely that all 24,000+ pages are so replete with *specific* information revealing intelligence sources and methods to require withholding. The FBI's declaration stands in stark contrast to agency declarations that courts have found sufficiently detailed to justify "sources and methods" withholdings. *Cf. Church of Scientology of California, Inc. v. Turner*, 662 F.2d 784, 786 n.4 (D.C. Cir. 1980) (per curiam) (affidavits supporting its Exemption 3 "sources and methods" withholdings "provided the kind of detailed, scrupulous description" allowing for effective judicial review where they gave "paragraph-by-paragraph analysis of each of the documents," indicating for each "the sender, the recipient, the source of the information, and why partial release was or was not possible," and described the expected harm). Given that FBI agents testified at Mr. Wamang's trial, it is also likely that intelligence sources and methods that the agency seeks to protect are already public.

Third, the FBI tries to withhold an unknown number of pages pursuant to Federal Rule of Criminal Procedure 6(e), suggesting that the rule "embodies a broad, sweeping policy of preserving the secrecy of grand jury material regardless of the substance in which the material is contained." (Seidel Decl. ¶ 75.) But courts have "never embraced a reading of Rule 6(e) so literal as to [permit withholding] over all matters . . . investigated by a grand jury." *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980) (en banc). In *Dresser*, the D.C. Circuit explained that—because "[t]here is no *per se* rule against disclosure of any and all [grand jury] information"—the touchstone is whether it would "tend to reveal some secret aspect," such as "the identities of witnesses" or "the substance of testimony." *Ibid.* Here, once again, little if any of the requested information would reveal a secret aspect, as multiple witnesses have already appeared and testified at the Indonesia trial.

Fourth, the FBI makes an overly broad invocation of the Pen Register Act, 18 U.S.C. § 3123(d), withholding not only the order but other "documents . . . that if disclosed would reveal the existence or use of a pen register or . . . reveal the existence of an investigation involving a pen register or trap and trace device." (Seidel Decl. ¶ 76.) However, the "Pen Register Act's sealing provision refers only to pen register orders; it says nothing about applications, supporting documents, or dockets." *In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders*, 964 F.3d

1121, 1130 (D.C. Cir. 2020); *accord Labow v. U.S. DOJ*, 66 F. Supp. 3d 104 (D.D.C. 2014), *vacated in part on other grounds,* 831 F.3d 523 (2016).  Thus, the FBI withholds more than the Act allows.

Fifth, the FBI invokes the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5319, but it is especially unclear how that statute "specifically exempts" the records at issue here.  The BSA only protects records collected by FinCEN, which is not a party to this suit.  Moreover, the request involves records related to the investigation of Anthonius Wamang—an Indonesian native, not a corporate entity—so it is unclear how the BSA could justify much, if any, of the withholdings.  Indeed, even to the extent that some commercial records are contained in the file about Freeport (or another company), the FBI does not enumerate a single type of BSA-protected record, such as a suspicious activity report or geographic targeting order.  *See Turner*, 2017 WL 1106030, at *5 (noting that even FinCEN produces "BSA" and "non-BSA" records).

I.      **The FBI Has Failed to Carry Its Burden as to Exemption 4.**

Exemption 4 permits withholding of "trade secrets and commercial or financial information," 5 U.S.C. § 552(b)(4), where such information is "(1) commercial and financial information, (2) obtained from a person or by the government, (3) that is privileged or confidential."  *Ctr. for Investigative Reporting v. United States Dep't of Labor*, No. 19-CV-05603-SK, 2020 WL 3639646, at *9 (N.D. Cal. July 6, 2020) (citing *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1194 (9th Cir. 2011)).  To be "commercial," records must relate to a company's "commercial *operations*" or its "the *income-producing aspects*," as "not every bit of information . . . qualifies for protection under Exemption 4."  *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983) (emphasis added); *cf. Watkins*, 643 F.3d at 1195 (commercial information "disclose[s] intimate aspects" of production).  And to be "confidential," the information must "both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy."  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019); *see also Ctr. for Investigative Reporting v. U.S. Cust. and Border Protec.*, No. 1:18-cv-02901-BAH, 2019 WL 7372663 at *12, n. 11 (D.D.C. Dec. 31, 2019) (requiring agency to meet both the "actually" and "customarily" prongs of this test).

1    Here, the Seidel declaration is once more insufficient to justify Exemption 4 withholding as

2    it vaguely asserts that "proprietary information" of an unnamed company appears in the withheld

3    records and that this information "is typically treated as private by the private commercial

4    institution(s) and it was shared with an expectation the FBI would not disclose this information

5    public[ly]." (Seidel Decl. ¶ 84.)

6    To the extent the FBI claims the records contain trade secrets, that assertion warrants

7    skepticism given the demanding burden necessary to meet that standard.  Courts limit the definition

8    of trade secrets under FOIA to records revealing a valuable formula, process or device.  *Pub. Citizen*

9    *Health Research Grp.*, 704 F.2d at 1289 (limiting trade secrets to only include "the productive

10   process itself"); *see also Citizens Comm'n on Human Rights v. FDA*, No. 92-CV-5313, 1993 WL

11   1610471 at *7 (C.D. Cal. May 10, 1993).

12   Similarly, the withheld records are unlikely to qualify as "confidential business information."

13   By providing zero information as to the company's identity or the information's nature, the FBI has

14   not carried its burden of demonstrating how its investigative file on Mr. Wamang qualifies as

15   "commercial."  The FBI has also failed to meet its burden to show that the records are customarily

16   or actually confidential, as it does not specify what the records are or what other industry leaders do

17   with the putative information.[14]  Furthermore, any confidentiality was presumably lost if records

18   were made public in trial or over time.  Finally, information withheld for reasons of corporate or

19   government embarrassment under Exemption 4 is explicitly prohibited.  *See United Techs. Corp. v.*

20   *U.S. Dep't of Def.*, 601 F.3d 557, 564 (D.C. Cir. 2010) ("Exemption 4 does not guard against mere

21   embarrassment in the marketplace or reputational injury")**Error! Bookmark not defined.**; *Martech*

22   *USA, Inc. v. Reich*, No. C-93-4137 EFL, 1993 WL 1483700, at *2 (N.D. Cal. Nov. 24, 1993)

23   (similar).  To the extent any information is withheld for that reason, the FBI must disclose it.

24   In sum, the FBI has not articulated a proper basis for Exemption 4 withholding.

25

26

27   [14] The FBI implies it never gave the unidentified company an "assurance of privacy," as required by
     courts.  *See Tokar v. U.S. DOJ*, CV 16-2410 (RC), 2019 WL 6910142 at *4 n. 7 (D.D.C. Dec. 19,
28   2019); *Ctr. for Investigative Reporting*, 2019 WL 7372663, at *14.  Instead, it merely states the
     company "expect[ed] that the FBI would not disclose" it publicly.  (Seidel Decl. ¶ 84.)

**J.      The FBI Has Failed to Carry Its Burden as to Exemption 5.**

Exemption 5 allows withholding of "inter-agency or intra-agency" records which "would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To qualify for Exemption 5's protection, a document "must fall within the ambit of a privilege against discovery," such as the attorney-client privilege, the work product privilege, or the deliberative process privilege.  *Dep't of Interior v. Klamath Water Users Prot. Ass'n*, 532 U.S. 1, 8 (2001).  For the deliberative process privilege to apply, the document must be "both 'predecisional' and part of the agency's 'deliberative process,'" *Kowack v. USFS*, 766 F.3d 1130, 1135 (9th Cir. 2014)," and the privilege must apply "narrowly," only to information that would "expose an agency's decision-making process," *Sierra Club Inc. v. USFWS*, 925 F.3d 1000, 1011 (9th Cir. 2019).  Accordingly, "factual material" is not protected.  *Kowack*, 766 F.3d at 1135.

The FBI attempts to justify withholding through tautology, stating that it "identified materials reflecting pre-decisional, internal agency deliberations falling squarely within the deliberative process privilege," but offering no description of the withheld documents.  (Seidel Decl. ¶ 87.)  Its assertions of the attorney-client privilege, (*see id.* ¶ 89 (identifying only "confidential communications")), and the work product privilege, (*see id.* ¶ 91 (identifying only "interagency materials 6 created by attorneys and/or at the direction of attorneys")), are similarly bare.  While CIR allows that *some* material within the 24,000+ withheld pages *may possibly* be protected by Exemption 5, the FBI must release factual information, as well as other segregable material.

**K.      Exemptions 6 and 7(C) Do Not Cover Known Identities or Official Misconduct.**

Exemptions 6 and 7(C) both exempt the release of records which would constitute an invasion of *personal* privacy.  5 U.S.C. §§ 552(b)(6), (b)(7)(C).  Exemption 6 covers "personnel and medical files and similar files," where disclosure "would constitute a *clearly* unwarranted invasion of personal privacy." *Id.* § 552(b)(6) (emphasis added).  "[A]n agency's burden under Exemption 6 . . . is an 'onerous' one." *Lawyers' Comm. For Civil Rights v. Dep't of the Treasury*, 2008 WL 4482855, at *19 (N.D. Cal. Sept. 30, 2008) (quoting *FBI v. Abramson*, 456 U.S. 615, 629 (1982)).  Exemption 7(C) covers "records or information compiled for law enforcement." *Id.* § 552(b)(7)(C).[15]

---

[15] Enacting 7(C), Congress adopted Exemption 6's language so the two are 'essentially the same.'" *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93, 96 n.1 (D.D.C. 2009).

-22-

Opp. to Def's Mot. Summ. J.; Not. of Cross Mot. and Cross Mot.
Summ. J.; Mem. in Supp. of Cross Mot. Summ. J.

In considering whether Exemptions 6 and 7(C) apply, courts consider: (1) the plaintiff's interest; (2) the public interest; (3) the degree of the invasion of personal privacy; and (4) any alternate means of obtaining the information. *Dobronski v. Fed. Commc'n Comm'n*, 17 F.3d 275, 278 (9th Cir. 1994).

The FBI's justification for the application of these exemptions is inadequate, as its declarations address these factors using only conclusory and boilerplate assertions regarding the "names and identifying information" of FBI Special Agents, FBI staff, other federal personnel, foreign law enforcement, and third parties such as victims and witnesses, (Seidel Decl. ¶¶ 195-104). *See Mead Data Ctr.*, 566 F.2d at 251 (agency declarations should provide a "relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant," absent which "the agency statement is not accorded deference"). The FBI has not provided the requisite specificity here. Moreover, in addition to the Plaintiff's and public's immense interest in this information, *see* Jones Decl. ¶¶ 2–23, there is no invasion of privacy as to any individuals already publicly identified, including by the FBI. *See* FBI National Press Office, *supra* (identifying victims Spier and Burgon); *see also* KIRKSEY, *supra* (embassy cable identifying FBI Agents Ronald Eowan and Paul Myers). And as to FBI staff whose names have not yet been disclosed, their privacy interests are "diminished" if the "information sought under FOIA would likely disclose official misconduct." *Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1025 (9th Cir. 2008) (internal quotation marks omitted). As the OIG Report makes clear, the FBI committed a "serious abuse of [its] authority" when, without "comply[ing] with . . . legal requirements," it obtained the telephone records of journalists who covered the 2002 ambush. OIG Report, *supra*, at 102, 104. Thus, any privacy interest of involved employees is "overcome [by] the public interest in disclosure of official misconduct." *Dobronski*, 17 F.3d at 279.

## L.     The FBI Has Not Met its Burden as to Exemption 7(D).

Exemption 7(D) protects from disclosure records and information compiled for law enforcement purposes that "could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. § 552(b)(7)(D). To meet its burden as to express assurances, the FBI must "'make an individualized showing of confidentiality with respect to each source'; confidentiality cannot be presumed." *ACLU of N. Cal. v. FBI*, No. 12-CV-03728-SI, 2015 WL 678231, at *7 (N.D. Cal. Feb.

-23-

17, 2015) (quoting *U.S. DOJ v. Landano*, 508 U.S. 165, 172 (1993)).  A "bald assertion that express assurances were given . . . is insufficient." *Billington v. U.S. DOJ*, 233 F.3d 581, 584 (D.C. Cir. 2000).  The agency also must "sufficiently describe[] circumstances that can provide a basis for inferring confidentiality." *Davin v. U.S. DOJ*, 60 F.3d 1043, 1063 (3d Cir. 1995).

The FBI candidly acknowledges that it "only describe[s] sources" at a "high level of generality" when invoking Exemption 7(D).  (Seidel Decl. ¶¶ 108 n.20, 113 n.2.)  This description is insufficient to "permit meaningful judicial review," as the FBI has not "present[ed] probative evidence that the source[s] did in fact receive an express" or inferred "grant of confidentiality," such as "notations on the face of [a] document, . . . personal knowledge . . ., [or] a statement by the source." *Campbell*, 164 F.3d at 34.  Accordingly, the Court must deny 7(D) withholding.

**M.    The FBI's Assertion of Exemption 7(E) Should Be Reviewed *In Camera*.**

Exemption 7(E) allows withholding of investigative techniques where disclosure would "risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  To justify non-disclosure, the agency "must provide non-conclusory reasons why disclosure of each category of withheld documents would risk circumvention of the law." *Feshbach v. SEC*, 5 F. Supp. 2d 774, 787 (N.D. Cal. 1997) (granting summary judgment for plaintiffs on (b)(7)(E)).  "Exemption 7(E) only exempts investigative techniques not generally known to the public," not "routine" techniques that "would leap to the mind of the most simpleminded investigator." *Rosenfeld v. U.S. DOJ*, 57 F.3d 803, 815 (9th Cir. 1995).

Here, the FBI seeks to withhold records related to techniques and procedures such as the "collection and analysis of information," "the types and dates of specific investigations," "database information," "surveillance techniques."  (Seidel Decl. ¶¶ 116–153.)  CIR concedes that it is possible that some of the information within the 24,400+ pages of responsive records may contain some exempted techniques or procedures.  However, given the age of these documents and the celerity with technology, it is unlikely any of the techniques from the FBI's early 2000s investigation are still in use.  Regardless, it cannot be gleaned from FBI's insufficiently vague declaration whether these techniques—generally described as "collect[ing] and analyz[ing] information," (Seidel Decl. ¶ 119)—are indeed sensitive and secret or merely public or routine.  Without more details as to these techniques, meaningful judicial review of the FBI's exemption claim is impossible.

**N.     The FBI's Assertion of Exemption 7(F) Should Be Reviewed *In Camera*.**

Exemption 7(F) permits the withholding of law enforcement records that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F).  The "subject of the danger" must be "identified with at least reasonable specificity." *ACLU v. Dep't of Def.*, 543 F.3d 59, 68 (2d Cir. 2008), *judgment vacated on other grounds*, 558 U.S. 1042 (2009).

The FBI asserts Exemption 7(F) to "protect the names and identifying information of individuals whom, if identified within the context of these records, the FBI believed would likely face violent retaliation."  (Seidel Decl. ¶ 155.)  It offers no more information as to who these individuals are, failing to even identify whether it is referring to U.S. citizens abroad, enemies of the Indonesian military, or members of TNI.  This is not "reasonable specificity." *ACLU*, 543 F.3d at 68.  While CIR understands and wholly respects that the purpose of this exemption is to avoid harm to human life, the FBI must still meet its burden.  And to the extent Exemption 7(F) material appears in the records, such information may be identified *in camera* and redacted before release.

## IV.     CONCLUSION

For the foregoing reasons, the FBI's motion for summary judgment should be denied, and CIR's cross motion for summary judgment should be granted.

Respectfully submitted,

DATED: November 13, 2020

s/ *D. Victoria Baranetsky*
D. Victoria Baranetsky
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890