# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

|   |   |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING, <br><br> Plaintiff, <br><br> v. <br><br> FEDERAL BUREAU OF INVESTIGATION, <br><br> Defendant. | Civil Action No. 3:19-cv-4145-LB |

## DECLARATION OF RAYMOND BONNER

I, Raymond Bonner, declare as follows:

1. I, Raymond Bonner, have personal knowledge of the matters stated in this declaration. If called upon to do so, I am competent to testify to all matters set forth herein.

2. I am a journalist with more than 35 years of professional experience at major publications including the *New York Times*, the *New Yorker*, *The Atlantic*, *ProPublica*, the *New York Review of Books*, and the *New York Times Book Review*. My reporting is international in scope, and I have filed stories from El Salvador, Peru, Sudan, Austria, Kuwait, Rwanda, Kurdistan, and Indonesia, among other countries. My reporting has been recognized through multiple awards, including the Overseas Press Club Award, the Edward R. Murrow Award, and the Louis M. Lyons Award for Conscience and Integrity in Journalism. I was also part of the *New York Times* team that was awarded the Pulitzer Prize in 1999.

3. I am the author of four non-fiction books. In 1984, I wrote *Weakness and Deceit: U.S. Policy and El Salvador*, which received the Robert F. Kennedy Book Award. In 1987, I wrote *Waltzing with a Dictator: The Marcoses and the Making of American Policy*, which received the Hillman Prize and the Cornelius Ryan Award. I am also the author of *At the Hand of Man: Peril and Hope for Africa's Wildlife* and *Anatomy of Injustice: A Murder Case Gone Wrong*.

4. Prior to establishing my journalism career, I was a practicing attorney and taught courses in law. I received my juris doctorate from Stanford Law School in 1967. Subsequently, I worked for the Public Citizen Litigation Group and the non-profit Consumers Union. I also directed the consumer fraud and white-collar crime unit of the San Francisco District Attorney's Office. Additionally, I instructed courses at the University of California, Davis School of Law.

5. From 2002 and 2007, I lived in Jakarta and reported on Indonesia for the *New York Times*.

6. While reporting in Indonesia, I reported on the 2002 ambush in West Papua, as well as its aftermath, including the apprehension of Anthonius Wamang. *See, e.g.*, Raymond Bonner, *Mystery Surrounds Deadly Ambush of American in Indonesia*, N.Y. TIMES (Sept. 2, 2002) https://nyti.ms/2GOZt3v; Raymond Bonner, *Jakarta Seizes 12 in Killing of 2 Americans*, N.Y. TIMES (Jan. 13, 2006) https://nyti.ms/3pgGlMZ; Raymond Bonner, *Indonesian Man Links Military to Shooting of U.S. Teacher*, N.Y. TIMES (Jan. 14, 2006) https://nyti.ms/3eJZ9Q6; Jane Perlez & Raymond Bonner, *A widow's long quest for justice in Indonesia*, N.Y. TIMES (Jan. 27, 2006) https://nyti.ms/2Ir7JHa.

7. In 2003, I reported that "Bush administration officials have determined that Indonesian soldiers carried out a deadly ambush that killed two American teachers returning from a picnic in a remote area of Indonesia last August, senior administration officials say."

Raymond Bonner, *U.S. Links Indonesian Troops to Deaths of 2 Americans*, N.Y. TIMES (Jan. 30, 2003) https://nyti.ms/2HD7NU7.  I also quoted a "senior administration official" as saying there "was no question there was a military involvement."  *Ibid.*

8.  The aforementioned January 30, 2003 story prompted a leak investigation within the Bush Administration, as documented in a report by the U.S. Department of Justice Office of Inspector General ("OIG").  *See* Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records*, *89-104*, U.S. DEP'T OF JUSTICE (Jan. 2010) https://bit.ly/2HDXoaA (hereinafter "OIG Report").  I attest that I am one of the reporters described in the OIG report.

9.  In 2004, as described in the OIG, federal agents obtained my telephone records as well as those of another *New York Times* reporter and two reporters from the *Washington Post* in connection with the leak investigation.  *See generally ibid.*

10.  My telephone records were obtained pursuant to an unlawfully issued exigent letter.  *See id.* at 89.

11.  Under the U.S. Government's policy regarding obtaining information members of the news media, federal agents are to make "all reasonable attempts" to obtain the sought information from "alternative sources," and must attempt to negotiate the voluntary acquisition of the journalist's records.  28 C.F.R. § 50.10 (2004). Additionally, any request for subpoenas of members of the news media must be approved by the Attorney General.  *See ibid.*  The regulation "also requires that if the telephone toll records of members of the news media are subpoenaed without the required notice, the affected member of the news media must be notified 'as soon thereafter as it is determined that such notification will no longer pose a . . . substantial threat to the integrity of the investigation' and, in any event, within 45 days of any return in response to the

subpoena." OIG Report at 90 (quoting 28 C.F.R. § 50.10). The regulation also provides that "failure to obtain the prior approval of the Attorney General 'may constitute grounds for an administrative reprimand or other appropriate disciplinary action.'" *Ibid.*

12. At some classified point in time, a supervisory special agent ("SSA") in the FBI's Communications Analysis Unit began working on the leak investigation. *Id.* at 92. The SSA was given my telephone number, as well as the telephone numbers of eleven other reporters. *Ibid.*

13. The SSA used an "exigent letter," which is an informal request for information to be used in urgent circumstances, *see id.* at 1, to obtain my records from an unidentified telecommunication company, *see id.* at 92-93. The SSA did so "without further discussion with the case agent or the Special Agent who had asked only whether such records could be obtained through the on-site providers, not that the records should be obtained." *Id.* at 93. As the OIG report states, the SSA "could not recall why he sent this exigent letter and acknowledged that the case agent had not asked him to do so." *Id.* at 94. Rather than consult with other federal officials as to the propriety of issuing an exigent letter, the SSA consulted with an analyst from an unidentified telecommunications company ("Company A"), "who told him 'explicitly that this was the approved process between the attorneys for [Company A], as well as, you know, . . . the attorneys for the Bureau.'" *Ibid*.

14. The OIG Report states that, after receiving the exigent letter, Company A "gave the FBI 22 months of records for Washington Post reporter Nakashima's telephone number, of which only 38 days fell within the 7-month period of interest initially identified by the case agent as relevant to the leak investigation." *Id.* at 95. The OIG Report also notes that for some of the telephone numbers, including my own, "none of the retrieved records provided to the FBI fell within the 7-month period of interest." *Id.* at 96. The OIG Report further notes that "Company A

provided the FBI with toll billing records for 1,627 telephone calls," and that "[o]f this total, only three calls (.2 percent) fell within the 7-month period of interest identified by the case agent as relevant to the investigation." *Ibid.* None of the relevant calls were connected with my phone number.

15. The OIG determined that my telephone records were improperly obtained, in violation of federal regulation, as it "found that no grand jury subpoena was issued for these reporters' records, either before or after the records were produced" and found that "no Department personnel sought Attorney General approval for subpoenaing these reporters' records, as required by federal regulations and Department policy." *Id.* at 97. The OIG concluded that the FBI personnel involved with this leak investigation, "failed to comply with legal requirements," "were negligent in various respects," used "lax and sloppy practices," and engaged in a "serious abuse of the FBI's authority." *Id.* at 102, 104. Further, the OIG found that the improperly issued exigent letter "contained inaccurate statements," namely that exigent circumstances existed at all and that a request for a grand jury subpoena had been submitted. *Id.* at 102-03.

16. My unlawfully obtained telephone records remained in a federal "database for over 3 years, unbeknownst to the prosecutor, CTD management, and FBI OGC attorneys, until OIG investigators determined that the records had been acquired and notified the FBI General Counsel." *Id.* at 102.

17. In response to the FBI's unlawful actions, then-Director Robert Mueller called the editor of the *New York Times* to "express regret that the FBI agents had not followed proper procedures when they sought the telephone records." *Ibid.*

18. On August 8, 2008, the Hon. Valerie Caproni, who was General Counsel of the FBI at the time, sent me a letter acknowledging that "required procedures were not followed" and

expressing that the "FBI deeply regrets that lapse." Attached hereto as Exhibit 1 is a true and correct copy of that letter.

19. I have truthfully written about the above-described experience for ProPublica. *See* Raymond Bonner, *How a Telecom Helped the Government Spy on Me*, PROPUBLICA (Oct. 3, 2013) https://bit.ly/2UcyvpB.

20. I have no question that the FBI's efforts to obtain my phone records related to my reporting on the 2002 ambush in West Papua.

I declare under penalty of perjury of the laws of the Northern District of California that the foregoing is true and correct to the best of my knowledge and belief.

Executed November 13, 2020, in Sydney, Australia.

   /s/ *Raymond Bonner*
Raymond Bonner
