D. Victoria Baranetsky (Cal. Bar No. 311892)
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br>Defendant. | Case No. 3:19-cv-4541-LB<br><br>**REPLY TO DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND CROSS-OPPOSITION TO PLAINTIFF THE CENTER FOR INVESTIGATIVE REPORTING'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  January 14, 2021<br>Time: 9:30 AM<br>Place: Courtroom B, 15th Floor |

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................. 1

II.  ARGUMENT .................................................................................................................... 2

   A.   FBI Improperly Withholds Information in the Public Domain and Incorrectly Applies a Standard Applicable Only in "*Glomar*" Cases. ............................................................. 2

   B.   The Government Fails to Show Foreseeable Harm Where FBI Released Information. ......... 6

   C.   The FBI Has Failed to Meet Its Burden of Showing That It Has Released All Segregable Material. ............................................................................................................. 7

   D.   *In Camera* Review Is Appropriate and Beneficial to the Court's Determination. ................. 8

   E.   Exemption 7(A) Does Not Apply Because Disclosure Cannot "Reasonably Be Expected To Interfere" With a Prosecution That Can Never Occur. ............................................... 9

   F.   The Government Concedes That It Has Failed To Carry Its Burden As To the Other Exemptions Asserted. ........................................................................................ 14

III. CONCLUSION ............................................................................................................... 15

**TABLE OF AUTHORITIES**

**CASES**

*ACLU v. CIA*, 710 F.3d 422 (D.C. Cir. 2013) ................................................................................ 3

*ACLU N. Cal. v. U.S. DOJ*, 880 F.3d 473 (9th Cir. 2018) ............................................................... 3

*Carter v. Dep't of Commerce*, 830 F.2d 388 (D.C. Cir. 1987) ........................................................ 8

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ................................ 2

*Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999) ............................................................................ 3

*Cumming v. United States*, No. 94-2070, 1995 22 U.S. App. LEXIS 20747 (1st Cir. Aug. 4, 1995) ............................................................................................................................... 13

*Davis v. U.S. DOJ*, 968 F.2d 1276 (D.C. Cir. 1992) .................................................................. 3–4

*EFF v. U.S. DOJ*, 4:11-cv-05221-YGR, ECF No. 85 (N.D. Cal. June 13, 2014) .......................... 8

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) ........................................................................ 4

*Gamble v. United States*, 139 S. Ct. 1960 (2019) .......................................................................... 13

*Gardels v. CIA*, 689 F.2d 1100 (D.C. Cir. 1982) ............................................................................ 3

*Gerstein v. U.S. DOJ*, No. C-03-04893 RMW, 2005 U.S. Dist. LEXIS 41276 (N.D. Cal. Sep. 30, 2005) ............................................................................................................................................ 13

*Greenberg v. FDA*, 803 F.2d 1213 (D.C. Cir. 1986) ....................................................................... 4

*Hamdan v. U.S. DOJ*, 797 F.3d 759 (9th Cir. 2015) ....................................................................... 7

*Hepting v. AT&T Corp.*, No. C-06-672 VRW, 2006 WL 1581965 (N.D. Cal. June 6, 2006) ........... 9

*Hersh & Hersh v. U.S. Dep't of Health and Human Servs.*, No. C 06-4234 PJH, 2008 WL 901539 (N.D. Cal. March 31, 2008) ............................................................................................................. 8

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93 (D.D.C. 2019) ...................... 6

*Lahr v. NTSB*, 569 F.3d 964 (9th Cir. 2009) ................................................................................. 14

*Leopold v. CIA*, 419 F. Supp. 3d 56 (D.D.C. 2019) ........................................................................ 5

*Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072 (9th Cir. 2004) ............................................... 8

*Mapother v. U.S. DOJ*, 3 F.3d 1533 (1993) .................................................................................. 10

*Maydak v. U.S. DOJ*, 218 F.3d 760, 764 (D.C. Cir. 2000) ............................................................ 15

*Minier v. CIA*, 88 F.3d 796 (9th Cir. 1996) .................................................................................... 1

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) ........................................................... 9

*North v. U.S. DOJ*, 892 F. Supp. 2d 297 (D.D.C. Sept. 26, 2012) .................................................. 3

*Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143 (9th Cir. 2008) ...................................... 13–14

*Phillippi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981) ........................................................................... 3

*Rugiero v. U.S. DOJ*, 257 F.3d 534 (6th Cir. 2001), cert. denied, 534 U.S. 1334 2002) ................. 8

*Roth v. U.S. DOJ*, 642 F.3d 1161 (D.C. Cir. 2011) ........................................................................ 3

*United States v. Yakoob*, No. 07-20084, 2009 U.S. Dist. LEXIS 7823 (E.D. Mich. Feb. 3, 2009) . 13

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) ........................................................................... 15

*U.S. DOJ v. Reporters Committee*, 489 U.S. 749 (1989) .............................................................. 14

*Willamette Industries, Inc. v. United States*, 689 F.2d 865 (1982) .................................................. 7

*Wilner v. Nat'l Sec. Agency*, 592 F.3d 60 (2d Cir. 2009) ............................................................... 3

**STATUTES**

5 U.S.C. § 552(a)(4)(B) ........................................................................................................... 8
 18 U.S.C. § 4100 ................................................................................................................... 13
18 U.S.C. § 4111 .................................................................................................................... 13
FED. R. CIV. P. 56(c)(4) ......................................................................................................... 11
9B FED. P., L. ED. § 22:2439 ................................................................................................. 12
Law of the Republic of Indonesia, No. 1, art. 7(1)-(2) (1979) (Indon.) ......................................... 10
Local Rule 7-4(b) ................................................................................................................... 14

**OTHER AUTHORITIES**

*Defendants Walk Out as FBI Agents Testify at Timika Trial*, WIKILEAKS (Sept. 12, 2006)
   https://bit.ly/3jBv99G ......................................................................................................... 1
FBI National Press Office, *Papuan Separatist Charged with the Murders of Two Americans,
   Attempted Murders of Others During 2002 Ambush in Indonesia* (June 24, 2004)
   https://bit.ly/3msVpVD ....................................................................................................... 1
Raymond Bonner, *New twist in deaths of Americans in Indonesia*, N.Y. TIMES (Jan. 13, 2006)
   http://nyti.ms/2KgscQp ...................................................................................................... 10
S. Eben Kirksey & Andreas Harsono, *Criminal collaborations? Antonius Wamang and the
   Indonesian military in Timika*, 16 S.E. ASIA RES. 165, 194 (July 2008) ................................. 10

**LEGISLATIVE MATERIALS**

149 CONG. REC. E1506 (daily ed. July 15, 2003) ........................................................................ 5
162 CONG. REC. H3714-01, H3717162 (2016) ........................................................................... 8
Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of Exigent
   Letters and Other Informal Requests for Telephone Records*, 89-104, U.S. DEP'T OF JUSTICE
   (Jan. 2010) https://bit.ly/2HDXoaA ..................................................................................... 6
 S. Hrg. 109-151, The Nomination of Dr. Condoleezza Rice To Be Secretary of State (Jan. 19,
   2005) ............................................................................................................................... 6

## I. INTRODUCTION

This case concerns a request for historical FBI files on the investigation of Anthonius Wamang and an ambush that occurred nearly two decades ago in West Papua, that was long ago prosecuted in Indonesia's courts. After the primary known perpetrator, Mr. Wamang, surrendered himself to the FBI, the agency released him into Indonesian custody, (*See* Pl.'s Br., Dkt. 45, at 4–6), after which he was prosecuted and convicted in an open court of law in Jakarta. Mr. Wamang received a life sentence, and remains imprisoned in Timika. (*See ibid.*). As these events unfolded, the FBI publicly acknowledged its investigation into the ambush on numerous occasions. Two of its agents participated in Mr. Wamang's 2006 trial, testifying and "introduc[ing] several videos into evidence." *Defendants Walk Out as FBI Agents Testify at Timika Trial*, WIKILEAKS (Sept. 12, 2006) https://bit.ly/3jBv99G. The agency's press office addressed the investigation via news release, FBI National Press Office, *Papuan Separatist Charged with the Murders of Two Americans, Attempted Murders of Others During 2002 Ambush in Indonesia* (June 24, 2004) https://bit.ly/3msVpVD, and FBI headquarters discussed the "almost four years" of work on the investigation at an agency awards ceremony. (Ex. 31 (FBI Awards Ceremony Transcript) to Jones Decl., Dkt. No. 45-5, at 4.) Despite these undisputed facts, the FBI claims its investigation into the matter somehow remains secret and ongoing, all without providing any specific or concrete information about when or how a prosecution of Mr. Wamang could or would occur in the United States. Given these facts and others, the Government simply has not met its burden for withholding under the Freedom of Information Act. *See Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996) (government bears "burden of proving the applicability of an exemption").

*First*, whether or not some of the requested information is statutorily exempted, much of it must still *must* be disclosed because it is in the public domain. Although the Government tries to claim the public domain doctrine requires that the information be officially acknowledged, that is the incorrect standard. In any event, even if that standard were to apply, the FBI's repeated disclosures about this case would still satisfy a heightened requirement.

*Second*, it follows that the amount of public information on the FBI's investigation necessarily prevents it from satisfying the foreseeable harm standard.

*Third*, even if *any* exemptions apply to some of the more than 24,000 pages of withheld records, the remaining information must still be disclosed where reasonably segregable.

*Fourth*, the Government's claim that Exemption 7(A) applies is facially unreasonable. The FBI relinquished Mr. Wamang to Indonesian authorities years ago and subsequently participated in his trial. And now, with Mr. Wamang in prison, the agency has failed to show that it could somehow reassert custody over Mr. Wamang. There is no real likelihood of obtaining Mr. Wamang from Indonesia, as no extradition treaty exists and Indonesian law bars transfers of its nationals. In the light of these insurmountable hurdles to prosecution and in the absence of any concrete information from the agency as to when or how its prosecution of Mr. Wamang would take place, the Government has not shown that disclosure of the requested records "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). Thus, Exemption 7 cannot not apply.

*Finally*, disclosure is also necessary because the FBI relies on insufficiently generic declarations that fail to meet FOIA's specificity requirements and do not fulfill the agency's burden of showing that Exemption 7(A) or any other remaining exemption applies. Its claims as to those remaining exemptions seem especially ill-founded, given that the agency failed to discuss any of them in any detail in its reply brief. (*See* Gov't Reply, Dkt. 50 at 10.)

Accordingly, this Court should deny the Government's motion for summary judgment and grant CIR's cross motion, or, in the alternative, order *in camera* review of the documents to determine the applicability of the asserted exemptions

**II.     ARGUMENT**

    **A.     FBI Improperly Withholds Information in the Public Domain and Incorrectly Applies a Standard Applicable Only in "*Glomar*" Cases.**

Regardless of whether any FOIA exemptions apply, the FBI must disclose at least a portion of the withheld records under the public domain doctrine, as CIR has previously established. (*See* Pl.'s Br. at 10–11.) The Government counters that this "public domain" argument is "fundamentally flawed" because, according to the FBI, it must only disclose "detailed information that the FBI itself has already 'officially acknowledged.'" (Gov't Reply at 7.) But this assertion conflates the ***public***

*domain doctrine* with the ***official acknowledgement standard***, which is applied in a *Glomar*[1] context and which is improper in the present case because the FBI has repeatedly acknowledged that the records exist. *North v. U.S. DOJ*, 892 F. Supp. 2d 297, 300 (D.D.C. Sept. 26, 2012) (distinguishing between "the 'public domain' exception" and "a *Glomar* response."). In contrast to the *official acknowledgment standard*, the *public domain doctrine* requires material to be disclosed as long as the specific type or category of information has entered the "public domain," regardless of whether such information has been officially acknowledged. *See, e.g.*, *ACLU N. Cal. v. U.S. DOJ*, 880 F.3d 473, 491 (9th Cir. 2018) (quoting *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)). However, even assuming *arguendo* that the *Glomar* circumstances were applicable here, Plaintiffs have amply shown that various members of government have officially acknowledged and disclosed the category of information at issue.

First, this Circuit and others apply the public domain doctrine in *any* context where the information is firmly in the public domain. *See ACLU N. Cal.*, 880 F.3d at 491. This more flexible standard does not require an acknowledgment of the information by the agency or an exact facsimile of the record, so long as the type of information is publicly available. *See Cottone*, 193 F.3d at 555 ("Yet by no means did [the D.C. Circuit in *Davis*] purport to establish a uniform, inflexible rule

---

[1] The official acknowledgment standard that is used in the "*Glomar*" context—and that the Government attempts to invoke here—is distinct and applies in the unique circumstances where the mere existence of the records themselves is secret, so the agency's official acknowledgment of the existence of the documents is necessarily crucial. *See generally Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981). For instance, in *Phillippi*, from which the term *Glomar* originates, the CIA would not confirm or deny the very existence of records about the U.S.S. Glomar. *Ibid*. The Court held that, in the absence of an official acknowledgment from the agency as to the existence of the relevant information, the records could remain secret. This relatively new doctrine has been adopted by courts in cases where agencies provide a "cannot confirm nor deny response." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)) (internal quotation marks omitted). In general, "Glomar responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information." *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013) (quoting *Roth v. U.S. DOJ*, 642 F.3d 1161, 1178 (D.C. Cir. 2011)). Once this *Glomar* response has been given, a requester seeking to overcome it must demonstrate that (1) the justifications for nondisclosure contradict other evidence in the record, *see Wilner*, 592 F.3d at 68; (2) the agency is withholding the records in bad faith, *see ibid*.; or (3) the existence of the records has been officially acknowledged, *see ACLU*, 710 F.3d at 426 ("[W]hen an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information.").

requiring every public-domain claim to be substantiated with a hard copy simulacrum of the sought-after material."); *Davis v. U.S. DOJ*, 968 F.2d 1276, 1280 (D.C. Cir. 1992) (explaining that courts have not adopted a "uniform, inflexible rule requiring every public-domain claim to be substantiated with a hard copy . . . of the sought-after material.")  In the national security and law enforcement contexts, the application of public domain doctrine may be more stringent, but still only requires that the same *type of information* and *level of specificity* be disclosed if already publicly available. *See Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) ("[T]he information requested must be *as specific* as the information previously released.").

Additionally, courts do not require the public domain information to be derived from any particular source. *See Greenberg v. FDA*, 803 F.2d 1213, 1217–18 (D.C. Cir. 1986). For instance, in *Greenberg*, the D.C. Circuit held that information generally available by cross-referencing sources—as is the case here—must be disclosed under the public domain doctrine. *Id*. at 1218. The disputed information in *Greenberg* was a CAT scan manufacturer's list of customers, *id*. at 1217, and the D.C. Circuit reversed the grant of summary judgment to the agency because of the availability of the information elsewhere, even though it was dispersed in various sources and not yet collected nor enumerated, *ibid*. The D.C. Circuit reasoned that because plaintiffs had shown that "a customer list could be reconstructed through one of several methods," the public domain doctrine was triggered as "such a list might well provide a close facsimile" of the requested records. *Id*. at 1218.

In this case, the public domain doctrine squarely applies because much of the *exact* information requested is publicly available through a variety of sources, including congressional testimony, an open trial, newspaper accounts, as well as diplomatic cables that have since been declassified or leaked. (*See* Pl.'s Br. at 10–11.)  This sheer volume of information about Mr. Wamang's case is enough to require further disclosure from the FBI. Indeed, the intensely public nature of this investigation prevented the Government from ever asserting a *Glomar* response in the first place because it could not have: On multiple occasions, it has publicly acknowledged and even publicized the investigation, rendering *Glomar* and the official acknowledgment standard irrelevant.

However, even assuming *arguendo* that the official acknowledgment standard is relevant, CIR has fulfilled its requirements, for it is not as insurmountable a bar as the Government suggests.

As the D.C. Circuit has stated, official acknowledgment justifies disclosure "regardless [of] whether [or not] the *contents* of the records have been disclosed." *ACLU*, 710 F.3d at 427 (internal quotation marks omitted and emphasis added). For instance, in *ACLU*, the statements made "d[id] not acknowledge" the *specific* CIA drone program at issue, but still they left "no doubt that some U.S. agency does" engage in the program, so the statements were sufficient. *Ibid.* ("Given these official acknowledgments . . . it is neither logical nor plausible for the CIA to maintain that it would reveal anything"); *see also Leopold v. CIA*, 419 F. Supp. 3d 56, 67 (D.D.C. 2019) (finding a short statement which gave only "*some* knowledge of *some* payments to Syrian rebels" was sufficient). Additionally, in contrast to the Government's assertion that only a "official press release or court pleading" qualifies as an official acknowledgement, (Gov't Reply at 11), courts do not require that a statement be delivered in a government forum or bear an agency insignia to be "official." Indeed, courts increasingly find informal statements made to the press and public—even on social media platforms—to be sufficient. *See, e.g.*, *ACLU*, 710 F.3d at 426 (deeming an acknowledgment made on a "live internet video forum" to be "official"). For instance, in *Leopold*, which involved a Twitter post, "[t]he Court agree[d] with Buzzfeed that there is no logical reading of the President's tweet in which the tweet does not acknowledge [the records]." 419 F. Supp. 3d at 67.

Here, the Government has gone well beyond discussing this case in a single tweet or in an off-the-cuff remark at a live online event, as was the case in *ACLU* or *Leopold*. For as the government admits, the agency had its own FBI agents,[2] appear at an open trial to testify about Mr. Wamang, and the FBI acknowledged the investigation and its details at a 2009 FBI awards ceremony. Additionally, the Government does not even address the fact that in 2003, Congress openly discussed "the [ambush that] was perpetrated by members of the Indonesian National Army Force." 149 CONG. REC. E1506 (daily ed. July 15, 2003) (statement of Rep. Greg Walden) ("[S]ince the attack occurred, evidence

---

[2] The Government contends that CIR has not proven that the trial was open for the agents' testimony. (*See* Gov't Reply at 10.) But it is clear the trial was open as reporters from the *Jakarta Post* were there to document what happened as the FBI agents testified. The agency also asserts that CIR has not shown that FBI agents were acting in their official duty or permitted to testify, but given that this kind of action would have certainly required agency approval and given that the agents were commended for their work in this case, (*see* FBI Awards Ceremony Transcript at 4), it is reasonable to infer that they were not acting outside of their duty.

has been brought to light suggesting that members of the Indonesian military, and not a rogue band of criminals, bears responsibility for the ambush."). Nor does the Government address the official acknowledgement at later Congressional hearings, *see, e.g.*, S. Hrg. 109-151, *The Nomination of Dr. Condoleezza Rice To Be Secretary of State*, 252 (Jan. 19, 2005), and in the Office of the Inspector General report. *See generally* Office of the Inspector General, *A Review of the Federal Bureau of Investigation's Use of Exigent Letters and Other Informal Requests for Telephone Records*, 89-104, U.S. DEP'T OF JUSTICE (Jan. 2010) https://bit.ly/2HDXoaA. Any of these statements alone would be enough to require some disclosure, but together they provide insurmountable proof that Plaintiffs have more than satisfied the requirements of both the public domain doctrine and the official acknowledgement standard.

### B. The Government Fails to Show Foreseeable Harm Where FBI Released Information.

In light of the amount of public domain information available about this investigation, the Government's belated effort to carry its burden of showing foreseeable harm is inadequate. The Government claims that it explained in "significant detail" what "multitude of harms" may come from disclosure, even where much information is already in the public domain. (Gov't Reply at 16.) It additionally claims that the wide availability of this "third party, public information" is insufficient to diminish any foreseeable harm because the FBI *itself* has not disclosed it. (*Ibid.*) However, this turns the foreseeable harm standard on its head, as the standard would serve little point if an agency could demonstrate foreseeable harm whenever it had not previously disclosed information. *See Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) ("The purpose of the [foreseeable harm standard] was to establish a 'presumption of openness,' and its passing was based on the recognition that 'from the beginning, agencies have taken advantage of these exemptions to withhold any information that might technically fit.'" (quoting 162 CONG. REC. H3714-01, H3717162 (2016))). And here, even if the Government were correct that foreseeable harm could be shown where the agency itself had not previously disclosed the relevant information, the FBI has admitted multiple places throughout its reply that it has entered evidence into the public domain, cementing that any foreseeable harm would be unreasonable and unlikely. (*See* Gov't Reply

Br. at 10 (discussing FBI agents' testimony at trial); *id.* at 11 (discussing FBI awards ceremony discussing investigation).)

### C. The FBI Has Failed to Meet Its Burden of Showing That It Has Released All Segregable Material.

Devoting most of its segregability argument to semantics,[3] the Government neglects to address how the agency has met the correct standard under FOIA. That is because it cannot. The bottom line is that under FOIA, "the agency cannot justify withholding an entire document simply by showing that it contains *some* exempt material." *Willamette Industries, Inc. v. United States*, 689 F.2d 865, 867 (1982) (emphasis added). "The burden is on the agency to show that all reasonably segregable portions have been disclosed," *Pac. Fisheries*, 539 F.3d at 1148, and it is reversible error for the district court "to simply approve" the government's bare assertions without "entering a finding on segregability," *Hamdan v. U.S. DOJ*, 797 F.3d 759, 779 (9th Cir. 2015); *see also Ortiz v. U.S. DOJ*, 67 F. Supp. 3d 109, 125 (D.D.C. 2014) ("So important is this [segregability] requirement that before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." (cleaned up)).

Here, while the Government's Third Seidel Declaration remains mum as to why not even a single sentence of known public information was disclosed, it lauds itself for releasing already publicly available news articles and press releases. The Declaration spends a half a page simply repeating that it released 398 pages of public source material in full, (*see* Third Seidel Decl., Dkt. 50–1, at 4), but offers no explanation as to why it failed to segregate *any* of the described public information from the more than 24,000 pages withheld in their entirety.

The Government goes even further and tries to reverse the burden on to CIR, asserting that CIR must show a "quantum of evidence" that the FBI has not segregated disclosable information. (Gov't Reply 17–18.) Leaving aside the fact that CIR has done more than that, that is not how segregability works in the Ninth Circuit. *See Pac. Fisheries, Inc.*, 539 F.3d at 1148. The burden is on the agency, *ibid.*, and the FBI has not carried it here.

---

[3] On segregability, the FBI uses its reply brief to split hairs. It asserts that CIR "misstate[d] the FBI's legal burden" for segregability, (Gov't Reply at 17), because CIR said it must justify segregability with "*specificity*" but the agency need only provide a "reasonably *detailed* description." (*Ibid*.)

### D.     *In Camera* Review Is Appropriate and Beneficial to the Court's Determination.

The Government suggests that only a "mélange of out-of-circuit law" justifies *in camera* review and that it is "not appropriate under Ninth Circuit law." (Gov't Reply at 14.) Those statements are patently incorrect. To the extent it would assist the Court in its segregability determination or any other determination, FOIA specifically authorizes *in camera* inspection, *see* 5 U.S.C. § 552(a)(4)(B); *see also Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1079 (9th Cir. 2004). And while the FBI warns that *in camera* review "should not be resorted to lightly," (Gov't Reply at 15 (citation and quotation marks omitted)), the law states that district courts have broad discretion exercising this power, *see Lion Raisins*, 354 F.3d at 1079.

*In camera* review is particularly apt in cases such as this one, where all four factors weigh in its favor: (1) "the government agency has not sustained its burden based on its testimony or declarations alone", *EFF v. U.S. DOJ*, 4:11-cv-05221-YGR, ECF No. 85 (N.D. Cal. June 13, 2014) (order granting *in camera* review); (2) the evidence suggests the agency did not act in good faith in the underlying actions, *see Rugiero v. U.S. DOJ*, 257 F.3d 534, 543 (6th Cir. 2001), *cert. denied*, 534 U.S. 1334 (2002); (3) judicial economy is not harmed, *see ibid.*, and; (4) "the public's interest in disclosure" is strong, *ibid*.

Here, for reasons explained below, the FBI's declarations are conclusory and general. *See supra* § VII. Moreover and most importantly, there is considerable evidence of bad faith in this case, including the agency's protracted delay in responding to Mr. Jones' request, which was filed in November 2015 and which the agency then prematurely closed, reopened and then failed to address for four years. *See Carter v. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987) (explaining that *in camera* review is '"plainly necessary" where bad faith exists, including excessive delay); *Hersh & Hersh v. U.S. Dep't of Health and Human Servs.*, No. C 06-4234 PJH, 2008 WL 901539, *5 (N.D. Cal. March 31, 2008) (naming delay as an example of bad faith). The underlying actions also involve demonstrated and acknowledged bad faith. (*See* Bonner Decl. ¶ 18 (describing letter from FBI's General Counsel Valerie Caproni acknowledging that the FBI's "required procedures" were not followed).) Additionally, the third factor, judicial economy, leans in favor of *in camera* review, as the Court's consideration of the withheld documents would obviate the potential need for

a *Vaughn* index, which the Government objects to creating, and any further motion practice.[4]  And to the extent that 24,000+ pages is too many to review, some courts have previously ordered portions of the records to be reviewed *in camera*.[5]  *See, e.g.*, *ACLU of N. Cal. v. FBI*, 881 F.3d 776, 777 (9th Cir. 2018).  Finally, in camera, is also supported by the immense public benefit in disclosure.  *See, e.g.*, *EFF v. DOJ*, 4:11-cv-05221-YGR, ECF No. 49, at 2–3 (N.D. Cal.).

### E. Exemption 7(A) Does Not Apply Because Disclosure Cannot "Reasonably Be Expected To Interfere" With a Prosecution That Can Never Occur.

In asserting its categorial Exemption 7(A) claim, the Government advances a position that would allow it to withhold the requested records for decades—without engaging in any investigatory activity—so long as it continues to appear at *pro forma* fugitive calendar calls while Mr. Wamang serves out his life sentence in an Indonesian prison.  This cannot be right.  Such a reading would vastly expand Exemption 7(A) beyond the language of the statute, a point that the Government attempts to obscure by objecting to CIR's declarations and diminishing basic principles of FOIA.

To begin, Exemption 7(A) does not apply where only the mere possibility of interference exists.  *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 230, 235 (1978) (holding that the government "cannot rely on hypothetical future proceedings" for Exemption 7(A) and requiring the government to show "a *concrete* prospective law enforcement proceeding").  Rather, the text of Exemption 7(A) permits withholding of "records or information compiled for law enforcement purposes, *but only to the extent* that the production of such law enforcement records or information . . . *could reasonably be expected to interfere* with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A) (emphases added).  Breaking this requirement down, "an agency must show that [the

---

[4] Although, CIR does not move for a *Vaughn* index at this juncture, it asserts that a *Vaughn* index may be useful and appropriate if the Court rejects the FBI's argument for categorical withholding under Exemption 7(A) but does not grant CIR's summary judgment motion in its entirety or orders *in camera* review as to the other exemptions.  The Court may order a *Vaughn* index at that time if necessary.  *See Minier*, 88 F.3d at 803 (explaining purpose of a *Vaughn* index).

[5] The FBI offers to "provide additional explanation *in camera ex parte* upon the courts request," (Gov't Reply at 14), but that solution would only be appropriate if it is offered in tandem with *in camera* review.  *See Hepting v. AT&T Corp.*, No. C-06-672 VRW, 2006 WL 1581965, at *1 (N.D. Cal. June 6, 2006) (noting that "the court would be remiss" to not review documents in camera while considering additional *in camera, ex parte* materials provided to the court) (internal quotation and citation omitted).

records or information] were compiled for law enforcement purposes and that their disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *Mapother v. U.S. DOJ*, 3 F.3d 1533, 1540 (1993).

Here, the Government has not satisfied the first and third of these elements. It cannot show that enforcement proceedings are "pending or reasonably anticipated," and accordingly it also cannot show that disclosure "could reasonably be expected to interfere" with any proceedings. *Ibid*. Put otherwise, it is unreasonable to conclude that disclosure of the requested records would interfere with a proceeding that *cannot occur*. As CIR has shown, Mr. Wamang was convicted and received a life sentence in Indonesia, and he remains imprisoned there. (*See* Pl.'s Br., at 5–6.) Indonesia has no extradition treaty with the United States, thus making any extradition legally impossible. (*See* Blake Decl., Dkt. 45-1, ¶¶ 8-10; Siregar Decl., ¶ 7 (quoting Law of the Republic of Indonesia, No. 1, art. 7(1)-(2) (1979) (Indon.)).)[6] Moreover, all of the Indonesian proceedings occurred after a 2006 meeting where Mr. Wamang voluntarily spoke with FBI agents and agreed to his surrender, and where "the FBI pledged to transport [Mr. Wamang] to the USA for trial." S. Eben Kirksey & Andreas Harsono, *Criminal collaborations? Antonius Wamang and the Indonesian military in Timika*, 16 S.E. ASIA RES. 165, 194 (July 2008); *see also* FBI Awards Ceremony Transcript at 4 ("[I]n 2006, [the FBI agents] designed and executed a highly complex ruse that led to the arrests of the 12 terrorists[.]"); Raymond Bonner, *New twist in deaths of Americans in Indonesia*, N.Y. TIMES (Jan. 13, 2006) http://nyti.ms/2KgscQp ("According to the men detained Wednesday, they were lured by

---

[6] The Government disputes this assessment, asserting that "not even The CIR's own declarant maintains that extradition is a 'legal impossibilit[y],'" pointing to Ambassador Blake's assessment that extradition was "unlikely." (Gov't Reply at 6 (quoting Blake Decl. ¶ 10).) Although the Government seizes on the fact that Ambassador Blake's statement was not absolute, it fails to meaningfully address the fact that Indonesian law expressly bars extradition where the relevant crime was perpetrated in Indonesia. *See* Law of the Republic of Indonesia, No. 1, art. 7(1)-(2) (1979) (Indon.) ("(1) A request for the extradition of a national of the Republic of Indonesia shall be refused. (2) A deviation from the provision . . . above may be made if in the view of the circumstances it would be better if the person concerned be tried at the place of the commission of the crime."). Because the 2002 ambush took place in Indonesia's West Papua province and *not* the United States, Mr. Wamang's extradition is indeed "legally impossible." (Pl.'s Br. at 14.)

the FBI into showing up at a small hotel, and were then promptly turned over to the Indonesian police.").[7] The FBI had its opportunity to seize Mr. Wamang for prosecution, and it declined it.

The Government nonetheless argues that it has satisfied Exemption 7(A)'s requirements because "the FBI has expressed its intention to pursue capture of Mr. Wamang *if he is released* from custody in Indonesia . . . and . . . the DOJ will pursue criminal prosecution of Mr. Wamang in the United States," again, "*if he is released* from Indonesian custody." (Gov't Opp. at 3 (citing Maisel Decl., Dkt. 42–2, ¶¶ 6, 10) (emphases added).)[8] But as already stated, it is uncontested and extremely germane that Mr. Wamang is serving a life sentence in Indonesia, a country that lacks an extradition treaty with the United States.[9] Thus, any stated intention by the Government to pursue capture and prosecution is irrelevant, because it simply cannot do these things.

In an apparent attempt to divert from these fatal facts, the Government attacks the admissibility of a declaration by Mr. Wamang's former attorney, Latifah Anum Siregar. (*See* Gov't Opp. at 3–4.) The Federal Rules of Civil Procedure set forth that declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). "Personal knowledge includes opinions and inferences grounded in observations and experience." *United*

---

[7] Although the Government accuses CIR of "internal inconsisten[cy]" with regard to its argument that "the FBI 'declined the opportunity to bring [Mr. Wamang] to justice in the United States'" in 2006, (*see* Gov't Opp. at 4 n.1 (quoting Pl.'s Br. at 13)), it fails to acknowledge that Mr. Wamang was not in Indonesian custody at the time of this meeting and that he was willing to come to the United States for trial in lieu of being tried in Indonesia. Importantly, extradition and voluntary surrender are different concepts. *See* 9B FED. P., L. ED. § 22:2439 (explaining that in the absence of an extradition treaty, the "alternative chosen in some cases is to . . . entice the accused to bring him or her within the territorial jurisdiction of the United States"). Now that the circumstances that engendered Mr. Wamang's voluntary surrender have changed—namely, his prosecution and conviction and Indonesia—it would appear that the Government's only options are to obtain custody over him from the Indonesian government, which is legally barred, *see* Law of the Republic of Indonesia, No. 1, art. 7(1)-(2) (1979) (Indon.), or to abduct him, which is again illegal.

[8] Contrary to the Government's assertion that CIR "fail[ed] to acknowledge" "relevant and uncontested" facts such as the open indictment against Mr. Wamang, (Gov't Opp. at 3), CIR extensively addressed such facts but explained that they are without consequence in light of Mr. Wamang's life sentence in Indonesia. (*See* Pl.'s Br. at 5–6, 13–14.)

[9] In his declaration, DOJ Chief Maisel also avers that "even in cases where there is not an extradition treaty with another country, 'the United States still retains the ability to obtain custody of such defendants—including by extradition or expulsion—if they ever travel outside the country where they were convicted.'" (Gov't Opp. at 6 (quoting Maisel Decl. ¶ 5).) But again, this conditional statement is contingent on Mr. Wamang having the ability to travel outside of Indonesia.

*States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015).  Here, Ms. Siregar grounded her personal knowledge in her experience as Mr. Wamang's attorney in 2006, as well as a prison visit with him just this year.  (*See* Siregar Decl. ¶ 3.)  Her "understanding" that the "FBI appeared to abandon its interest in any actual prosecution in Mr. Wamang" is derived from communications with her former client, who had two voluntary meetings with FBI agents prior to his apprehension and who "told [her] that the FBI never communicated with him subsequent to his arrest" and that he was "not aware of any communication from the FBI, subsequent to his arrest, with any attorney who has represented him." (*Id.* ¶¶ 4, 9.)[10]  Further, although Ms. Siregar is not an American attorney and thus not qualified to testify about United States federal law, she is certainly competent to testify as to Indonesian law, which precludes the transfer of Indonesian nationals whose crimes were themselves committed in Indonesia.  (*See id.* ¶¶ 2–3, 7–8.)  Given that Mr. Wamang remains in Indonesian custody, the effect of Indonesian law is certainly relevant to this case.

Additionally, the Government contends that CIR relied on inapposite law while relying on inapposite law itself.  It deems *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980), inapplicable because an "open indictment and active arrest warrant" exist in this case.  (Gov't Opp. at 4.)  But where nearly two decades have passed since the underlying incident and the subject of investigation is serving a life sentence, surely the basic principle that "[t]here is no reason to protect yellowing documents contained in long-closed files" is applicable. *Coastal States Gas Corp.*, 617 F.2d at 870.  The Government also asserts that *Barney v. IRS*, 618 F.2d 1268 (8th Cir. 1980), "supports the FBI's position," (Gov't Opp. at 5), because the Eighth Circuit, in 1980, concluded that Exemption 7(A) applied where individuals were under investigation for their 1975 tax returns and proceedings had not yet been brought, *see Barney*, 618 F.2d at 1270, 1273.  But that is a far cry from the situation here, where significant time has lapsed and the federal agency at issue cooperated with a prosecution of the subject that resulted in a life sentence.  Moreover, while *Barney*'s statement that "once enforcement proceedings are either concluded or abandoned, exemption 7(A) will no longer

---

[10] Significantly, this assessment is supported by statements made at the 2009 awards ceremony commending the FBI agents on the case, as they were described as "investigat[ing] this case for almost four years," a discrete period of time that does not suggest ongoing activity. (FBI Awards Ceremony Transcript at 4.)

1   apply to prevent disclosure" may be dicta, it is still an uncontroversial articulation of law based on
2   Supreme Court precedent. *Id.* at 1273–74 (citing *Robbins Tire*, 437 U.S. at 235).

3   In support of its position, the Government invokes *Gerstein v. U.S. DOJ*, No. C-03-04893
4   RMW, 2005 U.S. Dist. LEXIS 41276 (N.D. Cal. Sep. 30, 2005), for the proposition that "[w]hether
5   Mr. Wamang was subjected to enforcement proceedings in Indonesia has no bearing on whether
6   release of the challenged records 'could reasonably be expected to cause some articulable harm' to
7   a 'pending or prospective' law enforcement proceeding in the United States." (Gov't Opp. at 5
8   (quoting *Gerstein*, 2005 U.S. Dist. LEXIS 41276 at *21–22) (emphases omitted).)  But that case
9   concerned the withholding of "sealed warrants," *Gerstein*, 2005 U.S. Dist. LEXIS 41276 at *21, and
10  had nothing to do with a situation where the subject of a long-ago initiated investigation by one
11  nation had been imprisoned for life by another nation.  The Government also relies on *Gamble v.*
12  *United States*, 139 S. Ct. 1960 (2019), which concerns the dual sovereignty doctrine, to establish that
13  "the fact that there were enforcement proceedings somewhere in the world does not obliterate the
14  United States' distinct interests in ensuring that its own enforcement proceedings are not prejudiced
15  by premature release of law enforcement information or records." (Gov't Opp. at 5.)  But the dual
16  sovereignty doctrine has no bearing on this case, as the Government absolutely lacks the *ability* to
17  prosecute Mr. Wamang, since it relinquished him to Indonesian authorities who have since
18  imprisoned him for life.[11]

19  Although CIR believes that the Government cannot satisfy its burden as to Exemption 7(A)
20  because of the obvious impossibility of any enforcement proceedings, it again notes that if the Court
21  has questions about the pendency of the investigation and prosecution of Mr. Wamang, then it may
22  exercise its authority to review the withheld records *in camera* to determine whether recent activity

---

[11] Finally, the Government cites unpublished opinions from the First Circuit and from the Eastern District of Michigan that 18 U.S.C. § 4111 is "applicable only to offenders transferred from a foreign country for the express purpose of completing the execution of a foreign sentence in the United States." (*Ibid*. (quoting *United States v. Yakoob*, No. 07-20084, 2009 U.S. Dist. LEXIS 7823, at *8–9 (E.D. Mich. Feb. 3, 2009) (citing *Cumming v. United States*, No. 94-2070, 1995 22 U.S. App. LEXIS 20747, at *4–5 (1st Cir. Aug. 4, 1995)).)  Those opinions are, of course, not binding on this Court.  However, because 18 U.S.C. § 4100, which governs § 4111, provides that "[o]nly an offender who is a citizen or national of the United States may be transferred to the United States," CIR withdraws its argument as to § 4111's applicability to Mr. Wamang's circumstances, as he is an Indonesian national.

has occurred in Mr. Wamang's case or whether the FBI's investigation is in fact dormant. *See Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1150 (9th Cir. 2008) (discussing district court's authority to review documents *in camera*). If the Court's review demonstrates the latter, then the records cannot be withheld under Exemption 7(A).

### F.     The Government Concedes That It Has Failed To Carry Its Burden As To the Other Exemptions Asserted.

Rather than respond to any of CIR's substantive points regarding the inapplicability of Exemptions 1, 3, 4, 5, 7, 7(D), 7(E), and 7(F) to the requested documents,[12] the Government imputes an argument to CIR that was never made: that "[i]n effect, [] CIR is asking the Court—for the fourth time—to order the FBI to produce a detailed, document-by-document Vaughn index." (Gov't Opp. at 12 (emphases omitted).) CIR's opening brief contains a single sentence referring to a *Vaughn* index, which appears in the brief's procedural history summary, noting that the Court "did not require [the Government] to produce a *Vaughn* index" in its January 23, 2020 order. (Pl.'s Br. at 8.) In reality, CIR's brief asked only that the Government carry its burden as to the exemptions it asserted, as it is obligated to do, with or without a *Vaughn* index. *See U.S. DOJ v. Reporters Committee*, 489 U.S. 749, 755 (1989) ("Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden on the agency to sustain its action" (internal quotation marks omitted); *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009) ("FOIA's 'strong presumption in favor of disclosure' means that an agency that invokes one of the statutory exemptions to justify the withholding of any requested documents or

---

[12] On the eighteenth page of its reply brief, in violation of Local Rule 7-4(b) that a reply brief "may not exceed 15 pages of text," the Government does allude to one argument that CIR made as to Exemptions 6 and 7(D). There, the Government suggests that "CIR's brief includes a significant digression about a tangentially related FBI leak investigation, ostensibly to show that the FBI engaged in some wrongdoing regarding the 'underlying activities.'" (Gov't Opp. at 18). But this information is no digression, as the FBI's investigation of Mr. Bonner and other journalists occurred in response to the reporting on the 2002 ambush. Together, these incidents are the *very reason for this request*, and contribute to the newsworthiness of this material. Because CIR does not have access to the more than 24,000 pages of records that the FBI withholds, it can only operate on the assumption that some of the information contained therein addresses this surveillance and is being withheld on Exemptions 6 and 7(D) grounds. Accordingly, it is well within its right to object to such withholding and present arguments for disclosure. Indeed, in the absence of certainty on this point, it is incumbent upon CIR to defend its rights under FOIA for maximal disclosure.

portions of documents bears the burden of demonstrating that the exemption properly applies to the documents." (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).

And here, the Government has not carried that burden as to any of the asserted exemptions. The Government essentially concedes this point, acknowledging the "the lack of specificity in the Second Seidel Declaration." (Gov't Opp. at 14.)[13] The Government asks that it not "be prejudiced" for its failure "to provide additional information to support the underlying exemption claims," (*ibid.*), but that is not the standard in litigating FOIA requests.

## III. CONCLUSION

For the foregoing reasons, the FBI's motion for summary judgment should be denied, and CIR's cross motion for summary judgment should be granted.

Respectfully submitted,

DATED: December 29, 2020

s/ *D. Victoria Baranetsky*
D. Victoria Baranetsky
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

---

[13] Rather brazenly, after suggesting that CIR was attempting to relitigate the issue of the *Vaughn* index, the Government laments the lack of bifurcation of this case and casts aspersions on CIR's "own litigation choices," even though it was the Government itself that sought to break from the default summary judgment process. *See Maydak v. U.S. DOJ*, 218 F.3d 760, 764 (D.C. Cir. 2000) ("We have plainly and repeatedly told the government that, as a general rule, it must assert all exemptions at the same time, in the original district court proceedings.").